# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
October 16, 2013 Session

## HANNAH ANN CULBERTSON v. RANDALL ERIC CULBERTSON

**An Appeal from the Circuit Court for Shelby County**
**No. CT-005484      James F. Russell, Judge**

---

**No. W2012-01909-COA-R10-CV - Filed April 30, 2014**

---

This is the second extraordinary interlocutory appeal in this divorce case and custody dispute. In the first appeal, this Court held that the father did not automatically waive the psychologist-client privilege as to his mental health records by seeking custody or by defending against the mother's claims that he was mentally unfit. While the first appeal was pending, the mother filed a motion asking the trial court to require the father to undergo a second mental health evaluation pursuant to Tenn. R. Civ. P. 35; the trial court granted the motion. The Rule 35 evaluating psychologist concluded that the father did not pose a danger to his children. Dissatisfied with this conclusion, the mother again asked the trial court to compel the father to produce all of the mental health records from his treating psychologists. After this Court rendered its decision in the first appeal, the trial court granted the mother's request and again ordered the father to produce all of the mental health records from his treating psychologists. The trial court reasoned that the father waived the psychologist-client privilege as to all of his mental health records by allowing the evaluating psychologists to speak to his treating psychologists, by providing mental health records to the evaluating psychologists, and by testifying that he had a history of depression and had undergone treatment for it. It also ordered the father to produce all of his mental health records because the mother needed them to prepare her case. The father filed a request for a second extraordinary appeal, which this Court granted. We vacate the trial court's order as inconsistent with this Court's holding in the first appeal; we hold that there was at most a limited waiver of the psychologist-client privilege, only as to the privileged mental health information that the father voluntarily disclosed to the two evaluating psychologists involved in this case. As for mental health records not subject to a limited waiver of the privilege, we hold that the standard for the trial court to compel disclosure of the records is not met in this case. We remand the case for factual findings on any privileged mental health records the father voluntarily disclosed and other proceedings consistent with this opinion.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Circuit Court is Vacated and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Rachael E. Putnam and Austin T. Rainey, Memphis, Tennessee, for the Defendant/Appellant, Randall Eric Culbertson

Amy J. Amundsen and Mary L. Wagner, Memphis, Tennessee, for the Plaintiff/Appellee, Hannah Ann Culbertson

## OPINION

### FACTS AND PROCEEDINGS BELOW

#### Background

In this appeal, our recitation of the facts is taken from the record and from this Court's opinion in the first extraordinary appeal, *Culbertson v. Culbertson*, 393 S.W.3d 678 (Tenn. Ct. App. 2012) (*Culbertson I*). Defendant/Appellant Randall Eric Culbertson ("Father") and Plaintiff/Appellee Hannah Ann Culbertson ("Mother") married in 2004. Two children were born of the marriage. In July 2010, Father and Mother separated.

In November 2010, Mother filed a complaint for divorce in the Circuit Court of Shelby County, Tennessee. In her complaint, Mother alleged physical and emotional abuse by Father toward Mother and also toward the parties' young children. Based on the allegations that Father had anger issues and had physically abused Mother, the trial court granted Mother's *ex parte* request for an order of protection.[1] The order of protection prohibited Father from being around either Mother or the parties' children.

Later that same month, Father filed an answer and counter-complaint for divorce. In his answer, Father denied the abuse allegations in Mother's complaint and demanded "strict legal proof thereof." In his counter-complaint, Father asked the trial court to grant him sole decision-making authority as to the parties' children and to award him sole custody. Discovery ensued.

---

[1]This order of protection was extended numerous times.

-2-

## Consent Order

On November 22, 2010, the parties engaged in mediation. After the mediation, they entered into an agreement on certain *pendente lite* matters. On December 3, 2010, the trial court entered a consent order that included a temporary parenting schedule and temporary financial support. The consent order provided in part:

> [Father] shall continue counseling with Dr. Deason pending his commencing therapy with Dr. Russell Crouse, Ph.D. on December 14, 2010 and Mother shall commence therapy with Dr. Lisa Clark, Ph.D. The parties' minor children, and parents, as needed, shall be evaluated by Dr. Jane Clement and upon completion of her evaluation, Dr. Clement shall serve as the children's counselor. *The parties agree that Dr. Clement has permission to speak with the parties' respective counselors* and the parties shall cooperate in making the children available for the evaluation and counseling. Dr. Clement shall assist the Court and the parties by making recommendations as to the best parenting arrangement for the parties and children.

(Emphasis added). Thus, the parties agreed on Dr. Clement as an evaluating psychologist for the purpose of making a parenting recommendation to the trial court. They also agreed that Dr. Clement, in her capacity as evaluating psychologist, had "permission to speak with the parties' respective counselors." Under the consent order, Mother continued as primary residential parent and Father had supervised parenting time with the children several times a week. After entry of the consent order, Dr. Clement began the process of evaluating the parties.

## Mother's Request for Father's Psychological Records

In February 2011, Mother embarked on her quest to obtain Father's psychological records, the subject of this appeal. Mother issued three notices to take the deposition *duces tecum*, with accompanying subpoenas *duces tecum*, of three of Father's psychologists, David Deason, PhD., Wyatt Nichols, PhD., and Russell Crouse, PhD. The notices and subpoenas directed each psychologist to produce "all notes and records for or pertaining to sessions with [Father], and any test results or data received from the initial therapy session to the present date."

In response, Father filed a motion to quash. In his motion, Father argued that the information Mother sought was not discoverable because it was protected by the psychologist-client

privilege, pursuant to Tennessee Code Annotated section 63-11-213.[2] Father's motion to quash put at issue the question posed in this appeal.

On February 14, 2011, Dr. Clement filed her report and parenting evaluation with the trial court. The report said that Dr. Clement administered a variety of tests to the parties and conducted several interviews. It stated that Dr. Clement "had phone consultations with . . . Wyatt Nichols and Russell Crouse" and "reviewed a letter from David Deason," all Father's treating psychologists. The report detailed Dr. Clement's findings and ultimately recommended that Father "be afforded unsupervised and uninterrupted visitation with the children" on a graduated basis.

Not satisfied with Dr. Clement's report and recommendation, Mother promptly filed a "Motion for Release of [Father's] Psychological Records, to Compel [Father] to Execute HIPAA Authorization, and for Qualified Protective Order." Mother also filed a response opposing Father's motion to quash. In these, Mother argued that Father waived any privilege as to the records of Drs. Nichols, Crouse, and Deason by permitting Dr. Clement to consult with them in conducting her evaluation. She claimed that, once the consent order was entered, Father "had an understanding that any information communicated to his psychologists would also be communicated to Dr. Jane Clement," so he could not have expected that his communications with his treating psychologists would remain confidential. Mother also argued that Father had waived any privilege as to his mental health records; she contended that he placed his mental health "at issue" by denying Mother's abuse allegations and demanding "strict legal proof thereof," and also by seeking primary custody and unsupervised parenting time. Mother contended that Father sought to use Dr. Clement's report as a "sword" to obtain custody and to defend against Mother's abuse allegations, and at the same time as a "shield" to protect his communications with his treating psychologists.

---

[2]That statute provides:

> For the purpose of this chapter, the confidential relations and communications between licensed psychologist or, psychological examiner or, senior psychological examiner or certified psychological assistant and client are placed upon the same basis as those provided by law between attorney and client; and nothing in this chapter shall be construed to require any such privileged communication to be disclosed.

Tenn. Code Ann. § 63-11-213 (2010).

She cited Rule 703 of the Tennessee Rules of Evidence[3] and argued that, if the trial court can access the data and information underlying Dr. Clement's opinions in order to assess the reliability and trustworthiness of the expert's opinion under Rule 703, then Mother should have the right to access the same underlying data and information.

Father filed a response opposing Mother's motion for the release of his psychological records. Father maintained that his mental health records are privileged and that he did not waive the privilege by permitting Dr. Clement to speak to his treating psychologists. He also insisted that he did not put his mental health "at issue" either by seeking custody or by defending against Mother's allegations that he was mentally unstable.

### Father's Request for Unsupervised Parenting Time

On approximately the same date Mother filed her motion for the release of Father's psychological records, Father filed his own motion entitled "Motion for Temporary Parenting Schedule." Father's motion asked the trial court to grant him unsupervised parenting time with the children while the divorce proceedings were pending. Father's motion was supported by two affidavits. The first affidavit, by Dr. Clement, referred to her February 14, 2011 evaluation report to the trial court in which Dr. Clement recommended that Father "be afforded unsupervised and uninterrupted visitation with the children." The second affidavit in support of Father's motion was by former Shelby County Juvenile Court Magistrate Judge Claudia Haltom ("Judge Haltom"), one of the persons who supervised Father's parenting time with the parties' children. Similar to Dr. Clement, Judge Haltom stated that, based on her observation of Father's interaction with the children, she was "of the opinion that the children are very bonded and attached to Father" and that his "parenting skills are very good and he is very loving with the children." She noted that the children were reluctant to leave Father at the end of the visits, that he is an attentive parent, and that he showed good patience

---

[3]Rule 703 in its entirety states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

with the children. Judge Haltom's affidavit concluded, "[T]here is no need for continuing supervised visitation, and the children should immediately begin spending regular intervals of unsupervised parenting time each and every week with Father."

On February 25, 2011, the trial court summarily denied Father's motion for a temporary parenting schedule. In its order denying the motion, the trial court said that Father's request should not have been brought as a motion or set on the motion docket; rather, Father's "request [for unsupervised parenting time] should be in the form of a Petition."[4]

Soon thereafter, Father filed a "Petition for Temporary Parenting Plan," in accordance with the procedure outlined by the trial court. Not surprisingly, Father's petition made the same arguments that he made in his previously filed motion. The petition was set for hearing on April 15, 2011.

On March 25, 2011, the trial court conducted a hearing on Father's motion to quash Mother's notices to take the depositions of his treating psychologists, and on Mother's motion for the release of the treating psychologists' records. At the conclusion of the hearing, the trial court granted Mother's motion and directed Father to produce his mental health records subject to a protective order. The trial court explained: "[U]ltimately this Court will be called upon to make a decision or decisions that will manifestly take into account the overall state of this gentleman's mental health, and I do not believe that can be done without full evidence." Given this ruling, the trial court granted Father's motion to quash the requested depositions of Father's psychologists, subject to later renewal by Mother.

### Trial Court's First Order Requiring Disclosure

Following the March 2011 hearing, counsel for Mother gave Father's counsel a proposed order granting her motion for the release of the records of Father's treating psychologists, as well as a proposed consent protective order as to the records. Father refused to agree to entry of the proposed protective order because it allowed an "expert[] hired by a party" or "[a]ny person who is noticed for a deposition or otherwise subpoenaed to testify" access to Father's psychological records. This resulted in an impasse on the proper scope of the protective order.

Unable to agree on the language of the proposed protective order, the parties presented the matter to the trial court. Sweeping aside Father's objections, the trial court ordered Father's

_____

[4]The trial court said that it would "hear Father's request for a Temporary Parenting Schedule upon the filing of a Petition for Temporary Parenting Schedule, upon the parties attending the parenting class, and upon the parties mediating the issue."

counsel to sign the proposed protective order as written, and then entered it.[5]  On April 4, 2011, the trial court entered an order entitled "Order Granting [Mother's] Motion for Release of [Father's] Psychological Records, to Compel [Father] to Execute HIPPA Authorization, and for Qualified Protective Order."  As the title of the order suggests, the trial court ordered Father to execute a HIPAA release for "all records" of Dr. Nichols, Dr. Deason, and Dr. Crouse, and also ordered those psychologists to provide Mother's counsel all of the requested records.  The order stated that the records provided would be subject to the protective order. From this April 4, 2011 order, Father filed his first application for extraordinary appeal under Rule 10 of the Tennessee Rules of Appellate Procedure.

While Father's application for extraordinary appeal was pending, the divorce case proceeded in due course.  At an April 8, 2011 hearing on unrelated discovery disputes, the trial court summarily canceled the April 15, 2011 hearing that had been scheduled for Father's petition for a temporary parenting order.  The trial judge commented that the hearing on Father's petition would require two to three days of proof and added, "if we're going to do that, we may as well try the divorce."  The trial court then entered a scheduling order setting a trial date over two months later, on June 27, 2011, and stating that Father's petition for temporary custody would be heard at that time.

On June 1, 2011, Mother filed a motion to continue the trial scheduled for June 27. Mother's motion asked to continue the trial pending the appellate court's decision on whether to grant Father's application for a Rule 10 extraordinary appeal.

### First Extraordinary Appeal; Stay of Order

On June 20, 2011, while Mother's motion to continue the trial was pending, this Court entered an order granting Father's application for a Rule 10 extraordinary appeal. The appellate court order stayed the trial court's April 4, 2011 order requiring Father to release his psychological records.  The appellate court order states:

> Upon due consideration, the Court hereby grants the application as it relates to the issue regarding whether the trial court erred by entering the "Order Granting [Mother's] Motion for Release of [Father's] Psychological Records, to Compel [Father] to Execute HIPAA Authorization, and for Qualified Protective Order."
> . . .

---

[5]Although the title of the order describes it as a "consent" order, the parties agree that Father did not consent to its terms.

. . . [P]ending this Court's disposition of this extraordinary appeal, the Court hereby stays the operation of the trial court's order styled "Order Granting [Mother's] Motion for Release of [Father's] Psychological Records, to Compel [Father] to Execute HIPPA Authorization, and for Qualified Protective Order."

In light of the appellate court's grant of Father's appeal and its stay of the April 4, 2011 order, the trial court granted Mother's motion to continue the trial. The record does not indicate that any provision was made for a hearing on Father's petition for temporary custody in the wake of the continuance of the divorce trial.

### Mother's Petition For Rule 35 Evaluation and Restricted Visitation

A few weeks later, on July 13, 2011, Father was found walking aimlessly along Brownsville Road in Memphis. Allegedly, Father had been drinking alcohol and had made a call to a neighbor to say "goodbye." Unrelated bystanders called 911 to report seeing Father in this condition walking along the road, so local authorities picked Father up. Father was not arrested or charged by the authorities.

This incident prompted Mother, on July 18, 2011, to file a petition to enjoin Father from having any parenting time until he submitted to another psychological evaluation. In the petition, Mother described the July 13, 2011 incident and asked the trial court to order a psychological evaluation of Father. Mother's petition said that Father "previously had suicidal inclinations and advised third parties that he was going to kill himself." As an example, Mother described an incident that occurred at church approximately a year earlier, on July 11, 2010. In the incident, Mother claimed, Father became enraged and, "[a]fter rushing the pastor and throwing a park bench, [Father] advised those present that he was going home to hang himself so that [Mother] and the children would see him dead." Mother also asserted that, during the parties' marriage, Father "made numerous threats while driving to kill himself, [Mother], and the children." Mother's petition said that, unless the trial court suspended Father's parenting time pending a psychological evaluation, Father "may harm the children or himself in the presence of the children." Mother asked the trial court to suspend Father's parenting time until he obtained a psychological evaluation and an expert opinion that he is not suicidal and is mentally stable. The next day, Mother filed an amended petition to request in the alternative, if the trial court chose not to suspend Father's parenting time altogether, that it require him to exercise his parenting time under supervision at the Exchange Club.

Contemporaneously, Mother also filed a petition for another order of protection. The trial court granted a temporary order of protection pending a hearing initially scheduled for July 29, 2011. The hearing was then rescheduled to August 19, 2011.

On July 27, 2011, Father filed another proposed temporary parenting plan that included unsupervised parenting time and a response opposing Mother's petition to limit his parenting time. Father denied that he would cause any harm to the parties' children and argued that a psychiatric evaluation for him was unnecessary. The next day, Mother filed her own proposed temporary parenting plan, limiting Father's parenting time to visits at the Exchange Club.

### Hearing on Mother's Petitions

On August 19, 2011, the trial court conducted an evidentiary hearing only on Mother's petitions to require Father to undergo a psychological evaluation, to suspend or severely limit Father's parenting time, and for an order of protection. The trial court informed the parties that it would not consider Father's proposed temporary parenting plan at that hearing. Three people testified at the hearing: the pastor at the parties' church, Mother, and Father.

The pastor testified about the July 11, 2010 incident at the church. He recounted that, at the time, Father was upset and told the pastor that he was "going to hang [him]self in the living room, and [his] wife will come home and see [him] in all [his] glory." Father then picked up a bench and threw it about 5 feet behind him. The pastor then commented to Father, "I thought you told me you loved your wife," and Father responded that no one cared about him or knew what he was going through. Neither Mother nor the children were present during this incident. The pastor testified that Father later returned to the church and apologized for his behavior.

In her testimony, Mother said that, the night before the July 2010 incident at the church, she spent the night away from the marital residence. When she returned home the next morning, she saw Father yell at their son and spank him. Mother acknowledged that she was not present at the church incident, but said that others told her about it. After the July 2010 incident, Mother stated, she took the children to Indiana while Father voluntarily moved out of the marital residence. Thus, the July 2010 church incident apparently triggered the parties' initial separation.

Mother testified that, during their marriage, Father had several violent outbursts. She claimed that it was not safe to allow Father to have supervised parenting time with the children in Father's home because, she said, the persons who supervised his parenting time did not pay close enough attention. Mother was afraid that Father would "snap and do

-9-

something to [the supervisor] and take off with [the children.]" Mother claimed that Father had engaged in "violent, scary, threatening" behavior that caused her to fear for her life, install an alarm at her house, and sleep with a gun nearby. Mother said, "he keeps getting angry, then nice, then angry," and she asked the trial court to require Father to exercise his parenting time at the Exchange Club and to undergo a psychological evaluation. On cross-examination, Mother denied that she had an affair during the marriage but admitted to "adultery on two occasions."

Father testified at the hearing as well. He acknowledged having had violent tendencies but claimed that they were all in the past, all predating the filing of the divorce petition. Father asserted that, in the early years of the parties' marriage, he and Mother both had episodes of violence toward each other, and he added that he was ashamed of his past conduct. Father admitted "a lifelong battle with depression" for which he successfully sought counseling. Since November 2010, Father said, he had been taking anti-depressant medications for his condition. Asked whether the medicine had helped him, Father responded, "Tremendously."

Father described the pastor's account of the July 2010 incident at church as "poorly remembered." That day, Father said, he was distressed over Mother's extramarital affairs and sat on a bench to discuss it with the pastor. He told the pastor that he did not feel that "anyone cared what was going on," and specifically that he believed that the pastor did not care because the pastor was "not doing anything about it." At that point, Father said, he stood up and knocked over the bench but immediately picked it up and put it back in place. Father maintained that, at the time of that incident, he had no intent to harm himself or anyone else.

Father conceded that he had said numerous times in the past that he was going to hurt himself or commit suicide. Despite those statements, he emphasized, he had never actually attempted suicide. Father characterized his suicide statements as "cr[ies] for help," made "mainly for shock value."

When he was picked up on Brownsville Road in July 2011, Father testified, he was not intoxicated. He said that he had merely "gone for a walk" at around 8:00 p.m. Father claimed that he did not think that Brownsville Road would be busy that time of night. At the time, Father said, he was upset at the prospect of divorce, financial instability, and losing his family. He admitted that he made cell phone calls during the walk, as he frequently did, and that he was crying.

Father insisted that he had maintained a close bond with the parties' two children. He asserted that he was capable of taking care of the children and having unsupervised parenting time with them. He pointed out that he had sole responsibility for the care of the children

every night during the two-month period in which Mother was spending nights with an extramarital paramour.

Father's counsel had Dr. Clement come to the hearing to testify that Father was prepared to exercise unsupervised parenting time. The trial court, however, would not allow Dr. Clement to testify, stating, "I'm not sure what she knows that would bear upon the issues in [Mother's] petition." The trial court explained its decision to preclude Dr. Clement from testifying and to refuse to consider Father's petition: "If the Court sees fit to issue an order of protection, that will dictate the parenting schedule until we try the divorce case." Father submitted Dr. Clement's report as an offer of proof.

### Rule 35 Evaluation

At the conclusion of the testimony, the trial court granted Mother's request for an order of protection for one year. The trial court also granted her request to require Father to undergo a forensic examination pursuant to Rule 35 of the Tennessee Rules of Civil Procedure. In addition, it adopted Mother's proposed temporary parenting plan, which required Father to exercise his supervised parenting time with the children at the Exchange Club. On August 25, 2011, the trial court entered an order to that effect.

Pursuant to the trial court's order, Father retained John V. Ciocca, Psy.D., to perform the required Rule 35 evaluation.[6] After he performed the evaluations, Dr. Ciocca incorporated his findings and conclusions into a March 5, 2012 report filed with the trial court. At the outset of his Rule 35 report, Dr. Ciocca noted that Father was informed that "the evaluation would consist of individual clinical interviews, interviews with third parties, psychological testing, review of medical records and psychological records." The report stated that Father "agreed to authorize the release of records from previous medical and psychological providers as requested by this examiner." From his testing, interviews, and other resources, Dr. Ciocca opined that Father suffers from BiPolar II Disorder (predominantly depressive episodes), which was stabilized as a result of his medication. Dr. Ciocca's Rule 35 report concluded that Father was at that time "currently stable," that Father demonstrated "the ability to exercise reasonable judgment and decision making," and that Father did "not represent any threat to harm his children."

---

[6]On appeal, Mother implies that Dr. Ciocca was not an independent evaluator because Father chose Dr. Ciocca to perform the Rule 35 evaluation without her prior approval. We note that, in the trial court below, Mother did not object to the choice of Dr. Ciocca for the evaluation. Moreover, we have observed that the word "independent" does not appear in Rule 35. *See Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 146 (Tenn. Ct. App. 2011).

On March 28, 2012, based on Dr. Ciocca's Rule 35 evaluation and conclusions, Father again asked the trial court to set a hearing for his petition for a temporary parenting plan. The trial court declined Father's request for a hearing on his petition. It instead again deferred Father's petition for a temporary parenting plan to be heard at the same time as the parties' divorce trial; it then set the divorce trial for over three months later, on July 9, 2012.

### *Culbertson I*

On May 23, 2012, this Court issued its decision in ***Culbertson I***. *Culbertson v. Culbertson*, 393 S.W.3d 678 (Tenn. Ct. App. 2012) ("***Culbertson I***"). An understanding of the issues in that appeal and the appellate court's holding is important to the resolution of the issues in the instant appeal.

In ***Culbertson I***, Father asked the appellate court to hold that his psychological records are protected from discovery based on the psychologist-client privilege. In response, Mother argued that the trial court correctly ordered Father to disclose his psychological records. Mother asserted that Father had waived the psychologist-client privilege for the reasons stated in Mother's motion for release of Father's psychological records, summarized above.

In addressing the sole issue in ***Culbertson I***, namely, whether the trial court erred in granting Mother's motion for release of Father's psychological records, the appellate court outlined the parameters of the psychologist-client privilege, codified in Tennessee Code Annotated § 63-11-213. It noted that "the confidential communications between a psychologist and client [are treated] the same as those between an attorney and client." *Id.* at 684. Because the privilege "is designed to protect the client and because it belongs to the client, [it] may be waived by him." *Id.* (quoting *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984)). The opinion outlined the applicable law on waiver and emphasized that the paramount consideration remained the best interest of the children.

The appellate court in ***Culbertson I*** then specifically rejected Mother's argument that Father waived the privilege as to his psychological records, either by seeking sole custody of the children or by denying Mother's allegations of mental instability and demanding "strict legal proof" thereof. *Id.* at 685-86. The Court observed that, if the appellate court were to accept Mother's argument, "there would be no psychologist-client privilege in child custody cases; a party seeking privileged mental health records could obtain them simply by alleging the mental instability of his or her adversary." *Id.* at 686.

After rejecting that argument on waiver, the ***Culbertson I*** Court noted that the trial court had "provided no reasoning as to why Husband's psychological records were not protected from discovery by the psychologist-client privilege, or the extent to which Husband possibly

waived the privilege." *Id.* It held that the trial court erred in ordering disclosure of Father's records "without properly considering the application of the psychologist-client privilege or whether Husband waived the privilege." Nevertheless, in light of the concerns expressed by the trial court regarding the best interest of the children, the appellate court stated that Father's psychological records would be disclosed to the trial court for an *in camera* review for the purpose of the comparative fitness analysis of the parties.

Accordingly, the *Culbertson I* Court vacated the trial court's April 4, 2011 order requiring disclosure of Father's psychological records to Mother and remanded the case for further proceedings consistent with the opinion. Father then filed an application with the Supreme Court of Tennessee for permission to appeal the intermediate appellate court's decision in *Culbertson I*.

### Mother's Second Request for Father's Psychological Records

On July 4, 2012, shortly before the scheduled divorce trial and while Father's application to the Tennessee Supreme Court for permission to appeal was still pending, Mother filed a motion *in limine*. This motion was entitled "Motion in Limine to Exclude Evidence of Father's Psychological Condition, or in the Alternative, Motion for Specific Finding of Waiver of the Psychologist Patient Privilege" ("motion *in limine*"). As the title of Mother's motion suggests, she argued that, if Father persisted in claiming the psychologist-client privilege as to his psychological records, then the trial court should exclude from the divorce trial *all* evidence of his psychological condition, including the evaluations of Dr. Clement and Dr. Ciocca. In the alternative, Mother continued to argue that Father had waived the privilege. Mother again asked the trial court to compel Father to produce all records of all of the psychologists and medical professionals whom he had seen since the date the divorce petition was filed.

On the same day, Mother filed a motion to again continue the July 9, 2012 trial date and stay the proceedings until the Tennessee Supreme Court made a determination on whether to grant Father's request for permission to appeal in *Culbertson I*. In a related motion, filed that same day, Mother asked the trial court to extend the order of protection until the date of trial.[7]

---

[7]Mother alleged in her motion that extension of the order of protection was warranted because Father had shown up at Mother's June 2012 softball game, in violation of the August 2011 order of protection.

## Second Hearing

On July 9, 2012, the scheduled trial date, the parties appeared before the trial court prepared to try the divorce. On that date, Father filed another proposed parenting plan, again seeking unsupervised parenting time based on Dr. Ciocca's report.

At the outset of the hearing, the trial court heard arguments on Mother's pending motions, that is, her motion *in limine*, her motion to continue the trial, and her motion to extend the order of protection. After the arguments, the trial court denied in part the motion *in limine* and granted it in part. It denied Mother's request to exclude all evidence of Father's psychological condition, commenting that Father's "mental/emotional stability and well-being is not, 'just another issue' in this case. It is indeed the focal issue in the case." It agreed, however, with Mother's argument that Father waived the psychologist-client privilege by seeking to introduce into evidence the medical opinions of Dr. Ciocca and Dr. Clement, reasoning that both relied to some extent upon the opinions and records of Father's prior treating psychologists. The trial court explained:

> The statutory [privileges] available to [Father] [vis á vis] his mental health professionals, it is clearly waived under these circumstances. By declaring himself to now be sufficiently stable mentally in the face of the abundance of proof that has previously been presented to the Court to the contrary and seeking to support that position with now proposed expert testimony from mental healthcare professionals who have relied in part, at least, upon opinions and records of his prior treating psychologists and psychiatrists clearly defines the issue.
>
> Certainly [Mother] has every right to engage her own expert who will have available all of the information that would be deemed important to these such experts' opinions who may be presented on her behalf. Moreover, her attorney has every right in fairness to have such information — information available for the purpose of cross-examination of [Father] as well as his proffered professional witnesses. To be sure[,] to preclude [Father] from the opportunity to present his best evidence on his behalf would be an injustice. The motion in limine for that reason should be denied.
>
> By contrast and moreover to require [Mother] to proceed to trial without the benefit of the same information would work an even more grave injustice. This Court has no choice but to grant the motion for continuance and it will be done generally. So that means the parties will be free to pursue further preparation for trial by way of expert discovery and/or appeal or both.

-14-

In short, the trial court appeared to hold that Father waived the psychologist-client privilege by maintaining that he was mentally and emotionally fit, and also that Mother should have available to her Father's mental health records for cross-examination and for Mother's own expert witnesses. The trial court then granted Mother's motion to continue the trial, thus also deferring any consideration of Father's motion for unsupervised parenting time. The trial court specifically gave the parties the opportunity to conduct further discovery.[8]  In its oral ruling, the trial court did not mention the intermediate appellate court's directives to the trial court in the **_Culbertson I_** opinion.  **_See Culbertson I_**, 393 S.W.3d at 685-86.

On July 23, 2012, the trial court entered a written order that incorporated its oral ruling and made the following findings of fact and conclusions of law:

> 1.  It would be an injustice to preclude [Father] from presenting his best evidence in this matter, including evidence of his psychological condition.
>
> 2.  Accordingly, [Mother's] Motion in Limine to exclude evidence of [Father's] psychological condition is denied.
>
> 3.  However, it would also be an injustice to preclude [Mother] from offering her best evidence, which includes responding to [Father's] evidence of his psychological condition and the opinions of experts called by [Father] and reviewing the underlying data of those experts, pursuant to the Tennessee Rules of Evidence.
>
> 4. [Father] has sought through his own testimony to introduce proof of his psychological treatment, including declaring that he has been treated and seeking to use this evidence as proof that he has been rehabilitated.
>
> 5. [Father] has also sought to support his testimony with that of Dr. Ciocca and other experts, whom [Father] has allowed to speak with his psychologists and allowed to review [Father's] psychological records in forming their opinions.

---

[8] At the July 9, 2012 hearing, the trial court also heard proof on Mother's motion to extend the order of protection. The trial court credited Mother's testimony and found that Father went to Mother's softball game "with the full intention of intimidating" Mother, so it extended the order of protection.

6. It is clear that [Father] has waived the psychologist-patient privilege[9] provided in Tenn. Code Ann. § 63-11-213.

7. Therefore, [Father's] psychological records from Dr. David Deason, Dr. Russell Crouse, Dr. Wyatt Nichols, and all other psychologist, psychiatrist, and medical professionals, including but not limited to Dr. Les Smith, Dr. John Ciocca, Dr. Jane Clement and Dr. Lee McCallum, should be produced.

On September 10, 2012, Father filed this second Rule 10 application for extraordinary appeal. In it, Father sought permission to appeal the trial court's July 23, 2012 order requiring Father to produce all of his mental health records.

About two weeks later, on September 26, 2012, the Tennessee Supreme Court denied Father's application for permission to appeal in *Culbertson I*. The next day, on September 27, 2012, the mandate was transmitted to the trial court; this gave full force and effect to the decision of the intermediate appellate court.[10]

On November 9, 2012, this Court entered an order granting Father's second application for permission for a Rule 10 extraordinary appeal. The intermediate appellate court's order stayed the trial court's July 23, 2012 order, and it also stayed "all trial court proceedings regarding discovery of [Father's] psychological records, pending further Order of this Court." We now address the issues raised in this second extraordinary appeal.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father raises several issues:

1. Whether the trial court lacked subject matter jurisdiction to enter an order regarding the issue of privileged records when such issue remained on appeal and no mandate had been issued by this Court?

---

[9]The term "psychologist-patient privilege," used by the trial court and other authorities, and the term "psychologist-client privilege," used by this Court in *Culbertson I*, mean the same thing. Consistent with the nomenclature in the Tennessee privilege statute, Tennessee Code Annotated § 63-11-213, we refer to the privilege as the "psychologist-client privilege" throughout this opinion.

[10]Under Rule 42 of the Tennessee Rules of Appellate Procedure, the mandate is stayed when a party files for permission to appeal to the Supreme Court. The mandate "shall issue immediately" after the Supreme Court denies permission to appeal. Tenn. R. App. P. 42(b).

2. Whether the trial court erred by relitigating an issue which had already expressly been decided by this Honorable Court in violation of the law of the case?

3. Whether the trial court erred by ordering the release of Father's privileged psychological records without a proper legal analysis to support a conclusion that he had waived such privilege?

4. Whether the trial court denied Father due process and equal protection of the law in failing to amend the temporary parenting plan following the court-ordered evaluation?

In an extraordinary appeal, we use the same standards of review that are applied in an appeal as of right. *Peck v. Tanner*, 181 S.W.3d 262, 265 (Tenn. 2005).

Subject matter jurisdiction involves the trial court's lawful authority to adjudicate the controversy brought before it. *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000). The issue of whether subject matter jurisdiction exists is a question of law, so our standard of review is *de novo*, with no presumption that the decision of the trial court is correct. *Id.*; *see also Peck*, 181 S.W.3d at 265.

Father argues that the trial court violated the law of the case doctrine by acting in a manner that was contrary to this Court's remand order in *Culbertson I*. In general, under the law of the case doctrine, "an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publ'g Co. v. Tenn. Petrol. Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). The extent to which the law of the case doctrine precludes relitigation of issues that were decided in a prior appeal is a question of law, subject to *de novo* review.

Generally, a trial judge's ruling on a discovery-related issue will not be disturbed absent an abuse of discretion. *See Culbertson I*, 393 S.W.3d at 682-83. As described in *Culbertson I*, "[a] trial court abuses its discretion when it 'causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.' " *Id.* at 683 (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

We review the underlying factual findings using the preponderance of the evidence standard contained in Rule 13(d) of the Tennessee Rules of Civil Procedure, and we review the lower court's legal determinations *de novo* with no presumption of correctness. ***Id.***

In the order that is the subject of this interlocutory appeal, the trial court concluded that Father waived the psychologist-client privilege as to his psychological records. Generally, the issue of whether a party has waived a privilege is a mixed question of law and fact, subject to *de novo* review. ***Twin City Fire Ins. Co. v. Burke***, 63 P.3d 282, 285 (Ariz. 2003) (*en banc*; quoting ***Home Indem. Co. v. Lane Powell Moss & Miller***, 43 F.3d 1322, 1326 (9th Cir. 1995)); ***Walton v. Mid-Atlantic Spine Specialists, P.C.***, 694 S.E.2d 545, 550 (Va. 2010) (citing ***In re Grand Jury Proceedings***, 33 F.3d 342, 353 (4th Cir. 1994)). In applying this standard, we first determine whether the facts on which the claimed waiver is based are supported by a preponderance of the evidence in the record. We then determine, as a question of law, whether the facts as supported by a preponderance of the evidence constitute a waiver of the privilege. ***See Knipe Land Co. v. Robertson***, 259 P.3d 595, 603-04 (Idaho 2011); ***Cullen v. Valley Forge Life Ins. Co.***, 589 S.E.2d 423, 428 (N.C. Ct. App. 2003) (quoting ***Hicks v. Home Sec. Life Ins. Co.***, 39 S.E.2d 914 (N.C. 1946)); ***see also Advantor Capital Corp. v. Yeary***, 136 F.3d 1259, 1267 (10th Cir. 1998) ("Whether facts on which a claim of waiver is based have been proved, is a question for the trier of the facts, but whether those facts, if proved, amount to a waiver is a question of law.")); ***Johnson v. Rogers Mem. Hosp., Inc.***, 700 N.W.2d 27, 36 (Wisc. 2005) (noting that, when relevant facts are undisputed, issue of whether patient waived therapist-patient privilege is pure question of law). In the case at bar, Mother bears the burden of proving that Father waived the psychologist-client privilege. ***See BMG Music v. Chumley***, No. M2007-01075-COA-R9-CV, 2008 WL 2165985, at *5 (Tenn. Ct. App. May 16, 2008).

## ANALYSIS

## Subject Matter Jurisdiction

Father first argues that the trial court's July 23, 2012 order is a nullity because the trial court did not have subject matter jurisdiction over issues related to the disclosure of his psychological records. Until the Tennessee Supreme Court denied his Rule 11 application for permission to appeal and mandate was issued in September 2012, Father claims, jurisdiction over those issues remained in the appellate courts. In support, Father cites several cases for the proposition that, once a case is appealed, jurisdiction does not reinvest the lower court with jurisdiction to proceed with a case until the mandate is issued by the appellate court.

In response, Mother notes that the trial court did not lose jurisdiction over the entire case while Father's extraordinary appeal was pending. Rather, Mother contends, the trial court "maintained subject matter jurisdiction during the [interlocutory] appeal to enter an order correcting its previous error." Mother points out that the cases Father cites all involve appeals from final judgments. In contrast, the first appeal in this case was an interlocutory appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, and the appellate court did not stay the underlying divorce proceedings. Because the trial court was permitted to proceed with the underlying divorce, Mother argues, the trial court retained subject matter jurisdiction over the issues resolved in the July 23, 2012 order.

For a trial court's order to have any effect, the trial court must have jurisdiction over the subject matter of the order:

> A court's subject matter jurisdiction in a particular circumstance depends on the nature of the cause of action and the relief sought. It does not depend on the conduct or agreement of the parties, and thus the parties cannot confer subject matter jurisdiction on a trial or an appellate court by appearance, plea, consent, silence, or waiver.

*Dishmon v. Shelby State Cmty. College*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999) (citations omitted). The lack of subject matter jurisdiction is so fundamental that a judgment or order entered by a court without subject matter jurisdiction is void; when the appellate court determines that the trial court lacked subject matter jurisdiction, the appellate court must vacate the judgment below and dismiss the case without reaching the merits of the appeal. *First Am. Trust Co. v. Franklin-Murray Dev. Co., L.P.*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001); *Dishmon*, 15 S.W.3d at 480; *see* Tenn. R. Civ. P. 12.08.

Under the Rules of Appellate Procedure, the appellate court's grant of permission for an interlocutory appeal under Rule 10 does not transfer jurisdiction over the entire case to the appellate court, as would normally occur with an appeal as of right from a final judgment. Instead, with an interlocutory appeal, the appellate court's jurisdiction is limited to the issues specified in the appellate court's order granting permission for the appeal, and the balance of the case remains in the province of the trial court:

> The scope of the issues raised in Tenn. R. App. P. 9 and 10 appeals differs from the scope of the issues that can be raised on appeals as of right under Tenn. R. App. P. 3. Subject to the limitations in Tenn. R. App. P. 3(e) and 13(b), both the appellant and the appellee have broad latitude with regard to the issues they can raise on a direct appeal. The same is not the case for interlocutory appeals under Tenn. R. App. P. 9 or extraordinary appeals under

Tenn. R. App. P. 10.  For interlocutory appeals, the only issues that can be raised are those certified in the trial court's order granting permission to seek an interlocutory appeal and in the appellate court's order granting the interlocutory appeal.  *For extraordinary appeals, the issues are limited to those specified in this court's order granting the extraordinary appeal.*

*Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 914 (Tenn. Ct. App. 2000) (emphasis added; citations omitted); *see Shelby County Health Care Corp. d/b/a Regional Med. Ctr. v. Allstate Ins. Co.*, No. W2002-01439-COA-R9-CV, 2003 WL 22071464, at *6 (Tenn. Ct. App. Aug. 28, 2003).

Thus, we look first to the order granting permission for the interlocutory appeal in *Culbertson I* to ascertain the issues that were accepted by the appellate court in that first appeal.  In its June 20, 2011 order, the *Culbertson I* Court granted Father permission for an extraordinary appeal "as it relates to the issue regarding whether the trial court erred by entering the 'Order Granting [Mother's] Motion for Release of [Father's] Psychological Records . . . .' "  In *Culbertson I*, then, only the correctness of the trial court's April 4, 2011 order was before the appellate court. The appellate court stayed only the trial court's April 4, 2011 order, so the trial court was free to address any issue that did not fall within the ambit of that order.

As to the matters addressed in the trial court's April 4, 2011 order, the trial court did not reacquire jurisdiction over those matters until mandate issued in September 2012.  "The issuance of our mandate transfers jurisdiction back to the trial court."  *Tindell v. West*, No. E2012-01988-COA-R3-CV, 2013 WL 6181997, at *3 (Tenn. Ct. App. Nov. 25, 2013); *see also Sanders v. Loyd*, 364 S.W.2d 369, 371 (Tenn. Ct. App. 1961) ("It is the rule that a mandate or an order of remand is necessary to reinvest the lower court with jurisdiction to proceed with the case.").  For an interlocutory appeal, as to the matters appealed, the allocation of jurisdiction between the appellate court and the lower court is well-settled:

It should now be plain that once a party perfects an appeal from a trial court's final judgment, the trial court effectively loses its authority to act in the case without leave of the appellate court.  Perfecting an appeal vests jurisdiction over the case in the appropriate appellate court.  An appellate court retains jurisdiction over a case until its mandate returns the case to the trial court. These principles keep cases together during the appellate process and prevent undesirable consequences of permitting a case to be pending in more than one court at the same time.

***First Amer. Trust Co. v. Franklin-Murray Dev. Co., L.P.***, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001) (footnotes and citations omitted).

Therefore, at the time the trial court entered its July 23, 2012 order, the appellate court in ***Culbertson I*** still had jurisdiction over the issues that were addressed in the trial court's April 4, 2011 order, the subject of the appeal, because mandate had not yet issued. Thus, to the extent that the trial court adjudicated in its July 23, 2012 order an issue that fell within the scope of its prior April 4, 2011 order, that portion of the July 23, 2012 order is void for lack of subject matter jurisdiction, as jurisdiction over that issue was still vested with the appellate court.

To ascertain the extent to which the trial court's July 23, 2012 order is void, we first look at the issues within the scope of the April 4, 2011 order and addressed in ***Culbertson I,*** and then compare them with the issues addressed by the trial court in its July 23, 2012 order. Both the April 4, 2011 order and the July 23, 2012 order addressed the general issue of whether the trial court should compel Father to produce his mental health records, so we go on to examine the facts on which the trial court relied in making each ruling.

From our careful review of the record, it appears that some of the facts and events on which the trial court based its July 23, 2012 order occurred before Father filed his application for permission to appeal in ***Culbertson I,*** but most occurred after. In its July 23, 2012 order, the trial court held that Father waived the psychologist-client privilege based on Father's testimony at the August 2011 hearing and the fact that Father relied on reports by "Dr. Ciocca and other experts" who were "allowed to speak with his psychologists and allowed to review [Father's] psychological records in forming their opinions." Dr. Ciocca was not retained until after Father filed his application to the Tennessee Supreme Court for permission to appeal the intermediate appellate court's decision in ***Culbertson I***. Consequently, the question of whether Father's act of giving Dr. Ciocca access to his treating psychologists or his mental health records constituted a waiver of the privilege was not within the scope of ***Culbertson I***. Regardless of the correctness of the July 23, 2012 order or whether it was contrary to the intermediate appellate court's directive in ***Culbertson I***, the trial court retained subject matter jurisdiction to adjudicate matters that were not or could not have been within the scope of ***Culbertson I***. ***See Neiman v. Neiman***, No. M2008-02654-COA-R3-CV, 2009 WL 2707403, at *7 (Tenn. Ct. App. 2009) (holding that trial court had jurisdiction to consider husband's petition to decrease child support and alimony, even though first support order was on appeal, because husband's petition was based on new facts).

However, to the extent that the trial court's July 23, 2012 order decided an issue that was before the appellate court in the first appeal *and* based its holding on events that occurred

before Father filed his first application for permission to appeal, the order is void for lack of subject matter jurisdiction. *See In re M.J.H.*, 2013 WL 3227044, at *13 n. 6 (Tenn. Ct. App. June 25, 2013). In its July 23, 2012 order, the trial court concluded that Father voluntarily waived the privilege by making disclosures to Dr. Ciocca and "other experts." From our review of the record, the only "other" expert to whom this statement could refer is Dr. Clement. Consequently, it appears that the trial court's July 23, 2012 holding of waiver was based partly on alleged disclosures to Dr. Ciocca and partly on alleged disclosures to Dr. Clement. On July 23, 2012, the trial court did not have subject matter jurisdiction to adjudicate whether Father's disclosures to Dr. Clement constituted a waiver of the psychologist-client privilege, because that issue was within the scope of *Culbertson I* and was still pending before the appellate court.[11] Therefore, any holding in the trial court's July 23, 2012 order that Father's disclosures to Dr. Clement constituted a waiver of his psychologist-client privilege is void for lack of subject matter jurisdiction.

There is little indication in the record that the trial court separated out any matters that might still have been within the jurisdiction of the appellate court in *Culbertson I;* it appears that the trial court simply considered everything together. Thus, the part of the trial court's July 23, 2012 order that is void for lack of jurisdiction is subsumed within the remaining portion of the order that is not void. Consequently, as a practical matter, separating out the part of the trial court's July 23, 2012 order for which it lacked subject matter jurisdiction is like trying to unscramble an egg.

However, for purposes of our consideration of the substantive issues raised in this appeal, we need not parse out precisely which portions of the July 23, 2012 order are void for lack of jurisdiction. Because the appellate court in *Culbertson I* remanded the waiver issue to the trial court for reconsideration based on the appellate court's legal analysis, in this second appeal, we must review the trial court's entire adjudication of the waiver issue, considering events that occurred both before and after Father filed his first application for permission to appeal.

### Law of the Case

Father argues that, by addressing waiver of the psychologist-client privilege, the trial court violated the law of the case doctrine. He contends that "the central issue regarding [Father's] privileged psychologist-client records has already been litigated and adjudicated by the

---

[11]Mother relied on the alleged disclosures to Dr. Clement in support of her first motion for the release of Father's mental health records. It is unclear whether Mother also argued this to the appellate court in *Culbertson I*; it was not expressly resolved in *Culbertson I*, because the appellate court remanded the case to the trial court for reconsideration based on applicable legal principles.

Court" in *Culbertson I*, so the trial court was bound by the appellate court's holding. Father claims that the trial court erred in failing to follow the directive in *Culbertson I* to view his psychological records *in camera* and to conduct further proceedings in light of the legal principles outlined in the opinion. In these ways, Father argues, the trial court violated the law of the case, so this Court should vacate the trial court's July 23, 2012 order and remand the case for enforcement of the appellate court's decision in *Culbertson I*.

"The phrase 'law of the case' refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case." *Memphis Publ'g Co.*, 975 S.W.2d at 306 (citing 5 Am. Jur. 2d Appellate Review § 605 (1995)). The Tennessee Supreme Court has explained:

> . . . [U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to *dicta*.

> The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

> Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand.

*Id.* (citations omitted). Thus, the law of the case doctrine is not a constitutional mandate and does not implicate a court's subject matter jurisdiction. Rather, it is a judicial doctrine recognizing that issues that have already been litigated and decided "ordinarily need not be revisited." *Id.*

At the time the trial court issued its July 23, 2012 order, the appellate court had issued its decision in *Culbertson I,* and Father's application to the Tennessee Supreme Court was pending. When the appellate court's opinion in *Culbertson I* was filed, it became the law of the case, regardless of whether mandate had issued. However, as noted above, the trial court's July 23, 2012 order was based on facts that occurred both before and after Father filed his application for permission for the first appeal, which complicates application of the law of the case doctrine. *See Clingan v. Vulcan Life Ins. Co.*, 694 S.W.2d 327, 331 (Tenn. Ct. App. 1985) (holding that the initial appeal did not establish law of the case because facts in second appeal were not substantially the same as facts in prior appeal).

Regardless, in this appeal, we are charged with determining overall whether the trial court erred in holding in its July 23, 2012 order that Father waived the psychologist-client privilege either (1) by testifying about his "history of depression" and other psychological treatment at the August 2011 hearing, or (2) by disclosing his treating psychologists' records to either Dr. Ciocca or Dr. Clement or by giving Dr. Clement or Dr. Ciocca permission to speak to his treating psychologist. As our obligation to answer those questions is unaffected by the extent to which the law of the case doctrine may have applied to the trial court's July 23, 2012 order, we hold that Father's issue on the law of the case doctrine is pretermitted.

**Waiver**

In the order on appeal, the trial court held that Father generally waived the psychologist-client privilege as to any and all of his mental health records. The trial court based the waiver holding on the fact that Father "sought through his own testimony to introduce proof of his psychological treatment, including declaring that he has been treated and seeking to use this evidence as proof that he has been rehabilitated," and also that Father "sought to support his testimony with that of Dr. Ciocca and other experts, whom [Father] has allowed to speak with his psychologists and allowed to review [Father's] psychological records in forming their opinions." We consider whether the trial court erred in concluding that Father generally waived the psychologist-client privilege under these circumstances.

***Overview of Legal Principles***

"A privilege against compelled disclosure of relevant evidence 'runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth.' For that reason, in general, privileges are construed narrowly in favor of admitting relevant evidence." *Kinsella v. Kinsella*, 696 A.2d 556, 565 (N.J. 1997) (quoting *In re Selser,* 105 A.2d 395 (N.J. 1954)). The "communications privileges are generally considered to be premised on the following conditions: (1) the privileged communications originate in confidence; (2) confidentiality is an essential element of the proper relationship

between the parties; (3) the relationship is one that the community wishes to encourage; and (4) the injury caused by damaging the relationship through disclosure of the communications would be greater than the benefit gained." *Id.* at 565-566 (citing *Hague v. Williams,* 181 A.2d 345 (N.J. 1962), and 8 Wigmore on Evidence § 2285, at 527 (McNaughton rev. 1961)).

In this case, the principles surrounding the communications privileges must be applied in the context of a child custody dispute. This implicates the court's special responsibility to safeguard the children at the center of the litigation:

> [The trial judge] acts as *parens patriae* to do what is best for the interest of the child. He is to put himself in the position of a "wise, affectionate, and careful parent" and make provision for the child accordingly. . . . He is not adjudicating a controversy between adversary parties, to compose their private differences. He is not determining rights "as between a parent and a child," or as between one parent and another. . . . Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child.

*Id.* at 578 (quoting Cardozo in *Queen v. Gyngall,* 2 Q.B. 232, 241 (Esther, M.R.)(1893), *quoted in Finlay v. Finlay*, 148 N.E. 624, 626 (N.Y. 1925)).

As noted in *Culbertson I*, Tennessee recognizes by statute the psychologist-client privilege, and it is undisputed that Father's psychological records are "privileged communications" within the meaning of the statute:

> For the purpose of this chapter, the confidential relations and communications between licensed psychologist or, psychological examiner or, senior psychological examiner or certified psychological assistant and client are placed upon the same basis as those provided by law between attorney and client; and nothing in this chapter shall be construed to require any such privileged communication to be disclosed.

Tenn. Code Ann. § 63-11-213 (2010), cited in *Herman v. Herman*, No. M2012-00395-COA-R10-CV, 2012 WL 1655717, at *2 (Tenn. Ct. App. May 9, 2012); *see also* Tenn. Code Ann. § 24-1-207 (2000) (related to psychiatrists). The statute explicitly places the psychologist-client privilege on the same footing as the privilege between an attorney and his client.[12] Consequently, as we noted in *Culbertson I*, "although very few Tennessee

_____

[12]Unlike the attorney-client privilege, the psychologist-client privilege did not exist at common law "on the ground that the state's interest in the disclosure of all matters necessary to the administration of justice
(continued...)

appellate courts have had the opportunity to analyze the psychologist-client privilege, cases discussing the attorney-client privilege are instructive." ***Culbertson I***, 393 S.W.3d at 684.

Under Tennessee caselaw, the purpose of the attorney-client privilege "is to shelter the confidences a client shares with his or her attorney when seeking legal advice, in the interest of protecting a relationship that is a mainstay of our system of justice." ***Bryan v. State***, 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992). As we explained in ***Culbertson I***, the attorney-client privilege "encourages full and frank communication between attorney and client by sheltering these communications from disclosure." ***Culbertson I***, 393 S.W.3d at 684 (quoting ***State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust***, 209 S.W.3d 602, 615-16 (Tenn. Ct. App. 2006)). Similarly, the psychologist-client privilege fosters "full and frank" communications between patient and psychologist. In the context of a client's relationship with his psychologist, the United States Supreme Court has recognized that confidentiality is essential to successful treatment:

> In ***Jaffee v. Redmond***, 518 U.S. 1, 116 S. Ct. 1923, 135 L.Ed.2d 337 (1996), the United States Supreme Court explained the purpose behind the evidentiary privilege between a psychotherapist and patient:
>
>> Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.
>
> ***Id.*** at 10, 116 S.Ct. 1923 (citations omitted) (holding that a psychotherapist-patient privilege existed under federal common law, based in part on its recognition that "confidentiality is a *sine qua non* for successful psychiatric treatment.").

_____

[12](...continued)
predominates over the patient's need for confidentiality in regard to the disclosures he makes to his psychotherapist." B.W. Best, J.D., *Privilege, in judicial or quasi-judicial proceedings, arising from relationship between psychiatrist or psychologist and patient*, 44 A.L.R.3d 24 § 3(f) (1972); ***see Federal Ins. Co. v. Arthur Anderson & Co.***, 816 S.W.2d 328, 330 (Tenn. 1991). Therefore, the psychologist-client privilege is "traditionally regarded as a creature of statute." Best, 44 A.L.R.3d 24 § 3(f).

*Id.* at 683 n.4; *see Taylor v. United States*, 222 F.2d 398, 401 (D.C. Cir.1955) ("Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him."); *Kinsella*, 696 A.2d at 584 ("[A]lthough New Jersey's psychologist-patient privilege is modeled on the attorney-client privilege, the public policy behind the psychologist-patient privilege is in some respects even more compelling.").

Both privileges are important, but neither is absolute. Because the "privilege is designed to protect the client and because it belongs to the client, [it] may be waived by him." *Culbertson*, 393 S.W.3d at 684 (quoting *Smith Cnty. Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984)). Waiver can be express or it can be implied from the client's conduct.[13] We explained in *Culbertson I*:

> "If a client divulges the communications he seeks to protect, then he has waived the attorney-client privilege with respect to the reported communications and the attorney may testify to its contents." *State v. Buford*, 216 S.W.3d 323, 326 (Tenn. 2007) (citing *Bryan*, 848 S.W.2d at 80 (citing *Cooper v. United States*, 5 F.2d 824 (6th Cir. 1925))). Waiver may also occur when the communications take place in the presence of a third party. *State ex rel. Flowers*, 209 S.W.3d at 616 (citing *Boyd*, 88 S.W.3d at 218-19 (citation omitted)). Moreover, as explained by the Tennessee Court of Criminal Appeals in *Bryan*:
>
> > [A] party asserting the attorney-client privilege has impliedly waived it through the party's own affirmative conduct where three conditions exist:

---

[13] In a case involving waiver of a contractual term, this Court observed that the "often recited definition of 'waiver' as '[a] voluntary relinquishment by a party of a known right'. . . has been criticized as oversimplified and apt to lead to misconceptions." *GuestHouse Intern., LLC v. Shoney's North Am. Corp.*, 330 S.W.3d 166, 201 (Tenn. Ct. App. 2010) (internal citations and footnote omitted). The *GuestHouse* Court explained:

> A waiver. . . is generally defined as a voluntary and intentional relinquishment of a known right. . . . [T]here are few, if any, more erroneous definitions known to the law. For one thing, waiver is far more multifaceted than this definition would allow for. Moreover, even as far as it goes, it is totally misleading. It strongly implies that the waiving party intends to give up a right. In reality, many, if not most waivers are unintentional and frequently do not involve a "right" that the party is aware of.

*Id.* (quoting Joseph M. Perillo, Calarmari & Perillo On Contracts § 11:29(c)(5th ed.2003)).

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;
>
> (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and
>
> (3) application of the privilege would have denied the opposing party access to information vital to his [or her] defense.
>
> ***Bryan***, 848 S.W.2d at 81 (citing ***Hearn v. Rhay***, 68 F.R.D. 574, 581 (E.D. Wash. 1975)).

*Id.* at 684-85. The implied waiver described in ***Bryan*** is sometimes called an "at issue" waiver, because it arises when the holder of the privilege takes affirmative action to put the privileged information "at issue" and make it relevant to the case. In the case of an "at issue" waiver, application of the privilege would deny the opposing party information that is "vital" to his defense. *Id.*

As noted in ***Culbertson I***, "a parent's assertion of the psychologist-client privilege to prevent access to mental health records presents a more difficult issue than those raised in other situations involving the privilege. In child custody cases, the paramount consideration is the best interest of the child." *Id.* at 685. However, the ***Culbertson I*** Court cautioned: "Although the best interests of the children remain the focus of the trial court's concern when making custody determinations, the importance of the confidential relationship between a psychologist and client must not go unnoticed." *Id.* at 687.

We explicitly held in ***Culbertson I*** that "seeking custody does not, by itself, amount to an automatic waiver of the psychologist-client privilege," and that "denying allegations of mental instability and abuse" — or, in other words, asserting mental stability in response to the other party's allegations of mental *in*stability — without more, does not amount to automatic waiver. *Id.* at 686. Otherwise, ***Culbertson I*** observed, "there would be no psychologist-client privilege in child custody cases; a party seeking privileged mental health records could obtain them simply by alleging the mental instability of his or her adversary." *Id.*; *accord Peisach v. Antuna*, 539 So. 2d 544, 546 (Fla. Dist. Ct. App. 1989); *see Mohammad v. Mohammad*, 358 So. 2d 610, 613 (Fla. Dist. Ct. App. 1978).

This was the pivotal ruling in *Culbertson I*.  In so holding, the *Culbertson I* Court necessarily chose between two widely divergent approaches to the issue of waiver of the psychologist-client privilege.  "Courts are far from a consensus on how to handle this difficult and often painful situation."  James K. Filan, Jr., Psychotherapist-Patient Privileges in Child Custody Disputes: Connecticut and Beyond, 13 Bridgeport L. Rev. 281, 296 (Winter 1993).  As background for our analysis in this second appeal, we will outline both approaches to this issue.

Some states adopt a view of the psychologist-client privilege that is less protective of the privileged communications.  Under the less protective view, a party who seeks custody of his child or claims he is mentally stable in response to the other parent's claim that he is unstable automatically places his mental health "at issue" and waives the privilege as to all of his mental health records.  *See* 17 J. Am. Acad. of Matrimonial Law. 159, 172-77 (2001) (characterizing Alabama, Alaska, Indiana, Louisiana, Missouri, and Texas as adopting restrictive view); Ralph Slovenko, Child Custody and the Psychotherapist-Patient Privilege, 19 J. Psychiatry & L. 163, 172 (1991) (opining that, as of 1991 date of article, less protective view was "prevailing view").  One court refers to the less protective view as "the Alabama approach."  *Laznovsky v. Laznovsky*, 745 A.2d 1054, 1066  (Md. 2000) (citing *Thompson v. Thompson*, 624 So. 2d 619, 620 (Ala. Civ. App. 1993); *Owen v. Owen*, 563 N.E.2d 605, 608 (Ind. 1990); *Dawes v. Dawes*, 454 So. 2d 311, 312-13 (La. Ct. App. 1984)).  Some jurisdictions that follow this less protective approach mitigate its harsh effects by directing trial courts to review the privileged documents *in camera* to determine whether the relevancy of the documents is outweighed by the prejudicial effect.  *See Kinsella*, 696 A.2d at 581-82 (citing *Owen*, 563 N.E.2d at 608; *Morey v. Peppin*, 353 N.W.2d 179, 183 (Minn. Ct. App. 1984), *rev'd on other grounds*, 375 N.W.2d 19 (Minn. 1985); *Clark v. Clark*, 371 N.W.2d 749, 752-53 (Neb. 1985); *Kirkley v. Kirkley*, 575 So. 2d 509, 510-11 (La. Ct. App. 1991)).

Other states have adopted a view of the psychologist-client privilege that is more protective of the privileged communications.  Waits, *supra*, at 177-181 (characterizing Florida, Maryland, and New Jersey as following more protective view); Slovenko, *supra*, at 170 (opining that more protective view had been adopted by a "minority of courts" as of 1991 date of the article).  The more protective view of the privilege has been called the "Florida approach."  *Laznovsky*, 745 A.2d at 1069 (adopting "Florida approach" and citing *Cabrera v. Cabrera*, 580 A.2d 1227, 1230 (Conn. Ct. App. 1990); *Peisach v. Antuna*, 539 So. 2d 544, 546 (Fla. Dist. Ct. App. 1989); *State ex rel. Husgen v. Stussie*, 617 S.W.2d 414, 416-17 (Mo. Ct. App. 1981), *superceded by statute recognized in Roth v. Roth*, 793 S.W.2d 590 (Mo. Ct. App. 1990)).

In *Culbertson I*, the choice as to the approach to the psychologist-client privilege was presented as an issue of first impression in Tennessee.  The *Culbertson I* Court adopted the

more protective approach and held that Father did not automatically place his mental health "at issue" — and thus did not waive the privilege — either by seeking custody of the parties' children or by defending against Mother's assertion that he was mentally unstable.[14] Reasons for this choice include placing high value on the purpose of the privilege — to encourage parties to seek mental health treatment when necessary and help ensure the effectiveness of such treatment by protecting communications made in the course of treatment. *See Herman v. Herman*, No. M2012-00395-COA-R10-CV, 2012 WL 1655717 at *2 (Tenn. Ct. App. May 9, 2012) (while parties' mental health is relevant to best interest of child, this is not "a license to disregard statutory privileges from disclosure"). The reasons also include recognition that protecting the psychologist-client privilege may ultimately prove more beneficial to children than compelling disclosure, as the "value of the therapist-patient relationship and of the patient's privacy is intertwined with one of the most important concerns of the courts — the safety and well-being of children and families."[15] *Kinsella*, 696 A.2d at 584.

In this appeal, we apply the more protective view of the psychologist-client privilege adopted in *Culbertson I*. As there is no Tennessee caselaw on this issue outside of *Culbertson I*, we look to decisions from our sister states on how to apply this view of the privilege to the particular facts in this case. "When we encounter an issue of first impression, we often review the decisions of other states, as well as other authorities, to assist our analysis." *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013); *see also State v. Munn*, 56 S.W.3d 486, 495 (Tenn. 2001). Given the holding in *Culbertson I*, we give more weight to decisions from states that have also adopted the more protective approach to the psychologist-client privilege. On that premise, we consider the parties' arguments on appeal.

### *Specific Testimony*

We consider first whether Father's testimony placed his mental health at issue and constituted an "at-issue waiver" of the psychologist-client privilege. At the July 9, 2012

---

[14]A party can put his mental health "at issue" by affirmatively asserting a claim where an element of the claim implicates the claimant's mental wellbeing, as with a claim for emotional distress or mental pain and suffering. *See Kirchner v. Mitsui & Co. (U.S.A.), Inc.*, 184 F.R.D. 124, 127 (M.D. Tenn. 1998); *see also Sarko v. Penn-Del Directory Co.*, 170 F.R.D. 127, 130 (E.D. Pa. 1997); *Sidor v. Reno*, No. 95 Civ. 9588 (KMW), 1998 WL 164823, at *2 n.7 (S.D.N.Y. Apr. 7, 1998). Father has not asserted such a claim in this case.

[15]An excellent article discusses different states' approaches to application of the psychologist-client privilege in child custody cases. The author reviews studies that support the more protective view of the privilege and then concludes that abrogation of the "privilege in cases involving the welfare of children serves no one's best interest." Deborah Paruch, The Psychotherapist-Patient Privilege in the Family Court: An Exemplar of Disharmony Between Social Policy Goals, Professional Ethics, and the Current State of the Law, 29 N. Ill. U. L. Rev. 499 (Summer 2009).

hearing, the trial court ruled orally that, "[b]y declaring himself to now be sufficiently stable mentally in the face of the abundance of proof that has previously been presented to the Court to the contrary," Father "clearly waived" the psychologist-client privilege as to all of his mental health records. Denying Mother access to those records, the trial court stated, would work a "grave injustice" to Mother.

In the July 23, 2012 written order that followed, the trial court held similarly that because Father "sought through his own testimony to introduce proof of his psychological treatment, including declaring that he has been treated and seeking to use this evidence as proof that he has been rehabilitated," Father had waived the psychologist-client privilege as to all of his mental health records. The written order provides no additional legal basis for finding that Father's testimony constituted a general waiver of the psychologist-client privilege.

Although the trial court did not specifically describe the testimony on which it relied, from our review of the record, it is apparent that its decision was based on Father's August 2011 testimony. In this testimony, Father admitted "a lifelong battle with depression," and said that he had been prescribed medication for his condition. Father admitted he had made threats of suicide in the past but denied that he ever actually attempted suicide; he said that the past suicide threats were not genuine but were instead cries for help. Father testified that he was in counseling at the time Mother subpoenaed his mental health records. He stated: "I have gone to numerous counselors. . . . I am on medication now, where I wasn't before, I believe, on proper medication." Father said that he was under the care of a physician, and asserted that he would continue to see the treating physician to manage his medication. Counsel for Mother did not cross-examine Father at the hearing after the trial court indicated that such cross-examination was not necessary. The trial court would not permit Father to submit the testimony of Dr. Clement as part of his proof, either to support Father's own testimony or to rebut Mother's proof and arguments.

On appeal, Father argues that the trial court failed to abide by this Court's directive in **Culbertson I** in that the trial court failed to apply applicable legal principles and the law of waiver to the given facts. He insists that merely acknowledging in his testimony that he had undergone treatment for mental health issues did not constitute a waiver of the psychologist-client privilege as to his mental health records. Father claims that a holding of waiver must be based on a finding that he engaged in some "affirmative act" that placed his mental health "at issue" in the proceedings. Because his testimony was given only in defense to Mother's assertions, Father argues, he did not put his mental health "at issue" and therefore did not waive the privilege with respect to his mental health records.

In response, Mother maintains that the trial court was correct, that "through his own testimony on direct examination Father has attempted to assert his psychological condition

and treatment as a sword, utilizing the reports of Dr. Clement and Dr. Ciocca in support of his Petition for Temporary Parenting Plan and as a defense against Mother's Petition for Order of Protection and Petition to Enjoin Parenting Time." At the same time, Mother says, Father uses the psychologist-client privilege as a shield to prevent disclosure of his medical records. Mother asserts, "By voluntarily divulging his diagnosis, treatment plan and prognosis as conveyed to him by his prior psychologists, his treating psychiatrist and medical doctor, Father waived any privilege." *Id.* at 16.

In general, it is well-established that a party's testimony, in court or by deposition, can result in waiver of the psychologist-client privilege:

> Implied waiver of the psychologist-patient privilege can also occur inadvertently through previous testimony. Depositions are a key example of implied waiver by testimony. Prior to a deposition, the parties often agree that all objections, except those pertaining to the form of a question, should be reserved until trial. The "usual stipulation" shortens depositions while also allowing a broader range of discovery questions without forfeiting the right to later object. Claims of evidentiary and testimonial privilege, however, are viewed differently from objections and must be affirmatively asserted at every stage of the proceeding or they are waived. . . . Further, once a witness "waives his therapeutic privilege . . . he may not withdraw his waiver to prevent matters which he has already gone into from being explored in greater detail."

Marcia M. Boumil, et al., Article: Waiver of the Psychotherapist-Patient Privilege: Implications for Child Custody Litigation, 22 Health Matrix 1, 5-7 (2012) (footnotes omitted; citing *In re Sims*, 534 F.3d 117, 136 (2d Cir. 2008) (claimant did not put his mental health "at issue" by testifying that he received mental health care when emotional distress was not an element of his claim).

However, testimony that merely discloses the *existence* of a psychologist-client relationship "does not reveal a significant part of the communication and thus does not constitute a waiver." *San Diego Trolley, Inc. v. Superior Court*, 87 Cal. App.4th 1083, 1092 (2001) (quoting *Roberts v. Superior Court*, 9 Cal.3d 330, 340 (1973)). This is because the psychologist-client privilege "is not designed to specifically protect [a] psychotherapist's own opinion, observations, diagnosis, or treatment alternatives, particularly when such information finds its way beyond [a] patient's personal file;" rather, the privilege is "designed to protect disclosures made by [the] patient." Best, *supra*, 44 A.L.R.3d at § 4(e) (supp.). Thus, "[even when a patient has revealed the purpose of psychiatric treatment, no waiver of the privilege occurs. 'There is a vast difference between disclosure of a general

-32-

description of the object of . . . psychotherapeutic treatment, and the disclosure of all or a part of the patient's actual communications during psychotherapy.' " *San Diego Trolley, Inc.*, 87 Cal. App.4th at 1092-93 (quoting *Roberts*, 9 Cal.3d at 340).

This issue was presented on facts somewhat similar to the case at bar in *Graves v. Graves*, 967 A.2d 1024 (Pa. Super. Ct. 2009). In *Graves*, the father was the primary residential parent of the parties' child and the mother exercised regular visitation. The father discovered that the mother spent about two weeks receiving in-patient mental health treatment in a mental hospital. After he found this out, the father filed a petition to modify the parties' parenting arrangement and also to require the mother to disclose the records regarding that mental health treatment. *Graves*, 967 A.2d at 1027. At a hearing on the father's petition, the trial court permitted the father to question the mother about her mental health treatment. The mother testified that she sought care at the mental hospital because she perceived that her medication was not working properly, and that the in-patient stay at the hospital was for observation and monitoring of the medication. After the hearing, the trial court ordered the mother to execute a consent form releasing her medical records to the father. The mother appealed. *Id.* at 1027-28.

On appeal in *Gates*, the mother argued that her testimony was not a waiver of the privilege as to her mental health records. The father, however, claimed that she "waived her privilege of confidentiality by testifying, without objection, . . . about the specifics of her mental health treatment." *Id.* at 1031. The appellate court rejected the father's argument. It held that, although the mother testified about some details of her hospitalization, she steadfastly asserted the privilege as to her mental health records:

> . . . [D]uring the custody hearing, the trial court permitted Father to examine Mother, as if she was on cross-examination, in order to determine whether to compel Mother to release the pertinent mental health records. During the examination, Father elicited testimony from Mother concerning the circumstances of Mother's December 12, 2007 hospitalization generally, including her diagnosis, medications, and the nature of her post-discharge therapy. *See N.T.*, 3/28/08, at 6-15, 22-25. Although Mother did not object to Father's questioning, we are reluctant to conclude that Mother waived the statutory privilege of confidentiality.
>
> Mother consistently argued the requested information was privileged, and she reiterated her assertion during the *in camera* discussion immediately preceding the March 28, 2008 hearing that the trial court convened expressly to determine whether she must disclose the information she was attempting to shield. Moreover, the record reveals that Mother continued to challenge

-33-

Father's request for her mental health records after the cross-examination. N.T., 3/28/08, at 44. Thus, under the circumstances of the case at bar, we find that Mother did not waive her privilege of nondisclosure.

*Id.* at 1031-32. Importantly, the Pennsylvania appellate court said that it "acknowledge[s] and cannot emphasize too strongly [that] an expectation of confidentiality in mental health records is critical to effective mental health treatment." *Id.* at 1032. Contrary to the line of cases that are less protective of privileged communications, the *Graves* court stressed that the privilege is applicable in custody disputes, "especially where, as here, less intrusive alternatives exist to determine the effect of a party's mental health upon the child's best interest." *Id.*

In a Massachusetts criminal case, ***Commonwealth v. Clancy***, 524 N.E.2d 395 (Mass. 1988), the defendant was on trial for larceny. The case against the defendant was based in part on the testimony of one of the defendant's co-workers. At trial, the defendant sought discovery of the co-worker's mental health records in order to discredit the co-worker's testimony. The trial court rejected the defendant's request on the basis that the co-worker's mental health records were protected by the psychologist-client privilege. After that, the co-worker testified on direct examination about his mental health issues. The defendant then argued that the co-worker witness had waived the privilege by testifying about his mental health and that the defendant was therefore entitled to access all of the co-worker's mental health records. The trial court reviewed the co-worker's mental health records *in camera* to determine whether the mental health details revealed in the co-worker's testimony were privileged. After the *in camera* review, the trial court concluded that some of the details in the testimony were the subject of privileged materials, but other details were not. The trial court limited the defendant's discovery to the mental health records that related to the issues about which the co-worker testified at trial. The defendant was convicted and appealed the conviction. *Clancy*, 524 N.E.2d at 664-65.

On appeal in *Clancy*, the defendant argued that the trial court erred in refusing to give him access to *all* of the co-worker's mental health records. The *Clancy* appellate court rejected that argument and instead followed the reasoning in *Goldman*:

> In ***Commonwealth v. Goldman***, we addressed the issue of waiver of privilege in the context of the attorney-client privilege. There, we stated that, when a witness takes the stand, he does not automatically waive the attorney-client privilege. We stressed that such a situation presents two distinct possibilities, only one of which suggests a finding of waiver. An individual may testify "as to events which happen to have been a topic of privileged communication" without waiving his or her privilege. It is only when a witness testifies to the

-34-

specific details of an "identified privileged communication" that a finding of waiver may result. We believe that the reasoning underlying this dichotomy is equally applicable to situations involving the patient-psychotherapist privilege.

*Clancy*, 524 N.E.2d at 397 (citations omitted). Thus, the *Clancy* court held that testimony can amount to a waiver of the privilege only if it includes "the specific details of an 'identified privileged communication.' " *See Adler v. Adler*, No. 12 DRB 1632, 2012 WL 6709480 (D.C. Super. Ct. Dec. 11, 2012) (memorandum opinion and order).

From our review of the parties' arguments and these authorities, we are not persuaded that Father's August 2011 testimony constituted a waiver of the psychologist-client privilege. In his testimony, Father in essence conceded that he has a mental health condition and explained that he was being treated for that condition. His testimony did not divulge communications he had with his treating mental health providers, and he at all times continued to assert the psychologist-client privilege. The information about which Father testified was known to Dr. Clement, whose report was not privileged. Moreover, Father's testimony was given in defense to Mother's allegation that he was mentally unstable.

In sum, with either the attorney-client privilege or the psychologist-client privilege, when the holder of the privilege discloses privileged information in testimony, this can constitute a waiver of the privilege. *See Bryan*, 848 S.W.2d at 80 ("[W]aiver occurs any time a party testifies about purported communications between him or herself and the attorney, but seeks to prevent the opposing party's use of the attorney as a witness."). Likewise, if a party puts his mental health "at issue," this too can constitute waiver of the psychologist-client privilege.[16] In this case, Father did neither. His August 2011 testimony did not divulge privileged communications with his mental health providers and did not affirmatively put his mental health at issue because his testimony was given in response to Mother's assertion that he was mentally unstable.[17] Thus, Father's testimony at the August 2011 hearing did not constitute a waiver of the psychologist-client privilege.

Mother also argues that Father waived the psychologist-client privilege by attempting to use the reports of evaluating psychologists Dr. Clement and Dr. Ciocca as both a "sword and a

---

[16]*See supra* note 12.

[17]Father did not, for example, seek to introduce into evidence portions of his own mental health records to support his testimony. *See Roper v. Roper*, 336 So. 2d 654, 657 (Ct. App. Fla. 1976) (holding that the mother would be compelled to disclose her privileged medical records if she sought to rely on them in support of her testimony).

shield."  She claims that Father is using the evaluating experts' reports as a "sword" to seek unsupervised parenting time with the parties' children while at the same time using the evaluation reports as a "shield" to protect his own mental health records.[18]  **See Boyd v. Comdata Network, Inc.**, 88 S.W.3d 203, 226 (Tenn. Ct. App. 2002).

Mother's argument is based on fallacious reasoning. Drs. Clement and Ciocca were both retained to perform evaluations to assist the trial court in its parenting decisions in this case. In contrast to his communications with his treating psychologists, Father had no expectation that his communications with either Dr. Clement or Dr. Ciocca would be confidential.  The reports of the evaluating psychologists are not confidential and can be used by either party if they so choose.  Father's reliance on the reports of the evaluating experts does not constitute waiver of the privilege as to the records of Father's *treating* psychologists.

Therefore, neither Father's testimony nor his reliance on the reports of the evaluating psychologists resulted in a waiver of the psychologist-client privilege as to Father's mental health records. We address separately in the next section of our analysis whether any disclosure of Father's mental health records to either Dr. Clement or Dr. Ciocca, or any grant of permission for his treating psychologists to speak to Drs. Clement or Ciocca,  constitutes a waiver of the psychologist-client privilege.

### Disclosures to Evaluating Psychologists

We now consider whether either disclosure of Father's privileged mental health records to the evaluating psychologists or a grant of permission for them to speak to Father's treating psychologists constitutes a waiver of the psychologist-client privilege.  The question is a thorny one, and we address it in some detail.

The trial court based its conclusion that Father waived the psychologist-client privilege in part on its finding that Father "sought to support his testimony with that of Dr. Ciocca and other experts, whom [Father] allowed to speak with his psychologists and allowed to review [Father's] psychological records in forming their opinions."  As we note above, the only "other expert" to whom the trial court could be referring in this statement is Dr. Clement. Thus, the trial court appears to have made a factual finding that Father allowed either Dr. Ciocca or Dr. Clement or both to speak to his treating psychologists and to review his

---

[18]Mother's argument is a distortion of the classic "sword and shield" argument as to privileged communications, in which the holder of the privilege uses the privileged communications offensively in the litigation.  **See, e.g., Bryan**, 848 S.W.2d at 80 ("[A] client may not use his or her version of the events, involving the attorney, as a sword while raising the privilege as a shield to prevent the attorney from being used in responding to the attack.").

privileged mental health records. The trial judge gives no specifics as to the evidentiary basis for the finding or which "psychological records" he is referencing. The trial court's ruling gives no indication that it considered whether any purported waiver might be limited in scope. The trial court instead rendered a sweeping holding that there was a "clear waiver" by Father that justified full disclosure of any and all of his mental health records.

We examine the evidence in the appellate record underlying the trial court's conclusion. Dr. Ciocca's Rule 35 report states that, prior to Dr. Ciocca's evaluation, Father "agreed to authorize the release of records from previous medical and psychological providers as requested by [Dr. Ciocca]." Nothing in the appellate record identifies the mental health records Dr. Ciocca requested from Father, and nothing in the record indicates whether any such mental health records were in fact given to Dr. Ciocca. Dr. Ciocca's report states only that Father "has been under the care of a psychiatrist, Les Smith, M.D., since July 26, 2011," and that Father "has responded well to the medication treatment for his mood disorder according to the records of Dr. Smith and [Father's] report." Dr. Ciocca's report indicates that Dr. Ciocca reviewed "[t]he affidavit, report and complete notes of Dr. Jane Clement, Ph.D.," but of course none of those documents are privileged. Dr. Ciocca's report does not indicate whether he in fact spoke with any of Father's treating psychologists subpoenaed by Mother — Drs. Deason, Nichols, or Crouse. The summary of Dr. Ciocca's report says only that his opinion was based in part on his "review of *the available medical and psychological records*." (Emphasis added). Thus, in the appellate record before us, it is unclear whether Father disclosed to Dr. Ciocca any privileged mental health records or communications and, if so, the extent of such disclosure.

Dr. Clement also served as an evaluating expert by agreement of the parties.[19] Her evaluation was performed to "assist the Court and the parties by making recommendations as to the best parenting arrangement for the parties and the children." The agreed order on Dr. Clement indicates that, to facilitate the evaluation, Father gave Dr. Clement permission to "speak with" his treating psychologists; the order does not mention permission to review any prior mental health records. Dr. Clement refers in her report to "phone consultations with . . . Wyatt Nichols and Russell Crouse," two of Father's treating psychologists, and states that she "reviewed a letter" from the third treating psychologist, David Deason, in the course of her evaluation.

---

[19]There are "[f]ew precedents construing Tenn. R. Civ. P. 35 exist because physical and mental examinations of parties or persons in the custody of a party are usually done by agreement without the intervention of the courts." ***Odom v. Odom***, M1999-02811-COA-R3-CV, 2001 WL 1543476, at *5 (Tenn. Ct. App. Dec. 5, 2001). In the case at bar, the parties entered into such an agreement to have Dr. Clement evaluate them to assist the trial court in arriving at an appropriate parenting arrangement. Under these circumstances, Rule 35 applies to Dr. Clement's evaluation and her report is discoverable. ***See*** Tenn. R. Civ. P. 35.02(3).

Father argues on appeal that the trial court erred in concluding that any agreement to provide his privileged mental health records to Drs. Clement and Ciocca constituted a waiver of the psychologist-client privilege. He acknowledges that the reports of both evaluating psychologists are not confidential, but claims that even if either Dr. Ciocca or Dr. Clement reviewed past mental health records, this was not a waiver of the privilege. Father also contends that any agreement to permit Dr. Clement and Dr. Ciocca to speak with his treating psychologist did not constitute "a waiver over all of [Father's] private communications with his psychologists." Moreover, Father argues, Mother would not need all of his mental health records to cross-examine the evaluating psychologists, as "only their underlying data would be relevant or necessary for such purposes." Father claims, without citation to authority, that the purpose of having a Rule 35 psychological examiner evaluate a party is to protect the privileged mental health records of the party's treating psychologist. Thus, Father argues that all of his mental health records remain protected by the psychologist-client privilege.

In response, Mother urges this Court to conclude that Father's disclosure of privileged mental health records to Drs. Ciocca and Clement, and his grant of permission for the evaluating psychologists to talk to his treating psychologists, all amounted to a waiver of the psychologist-client privilege as to all of his mental health records, because a party waives any applicable privilege by voluntarily divulging protected information to a third party, including a Rule 35 examiner. Mother cites *Ghayoumi v. McMillan*, No. M2005-00267-COA-R3-CV, 2006 WL 1994556 (Tenn. Ct. App. July 14, 2006), for the proposition that Father had no reasonable expectation of confidentiality as to any information provided to a court-ordered Rule 35 expert. Mother argues: "Father should not have expected that any information, from any source or in any format, revealed to either Dr. Ciocca or Dr. Clement would remain confidential."

Initially, we must note that *Ghayoumi*, the case upon which Mother relies, does not get us very far in our analysis. In that case, the plaintiff was the father in a divorce case, and the defendant was a clinical psychologist who had performed a court-ordered evaluation of both parents in the father's divorce. *Ghayoumi*, 2006 WL 1994556, at *1. In the course of the divorce proceedings, after the defendant psychologist spoke with the father, the psychologist told the mother that the father knew where she was then living.[20] The father asserted that his sessions with the defendant psychologist were privileged and argued that the defendant psychologist breached his duty to keep confidential any communications between them. *Id.* at *2. The trial court granted summary judgment in favor of the psychologist, and the father appealed. *Id.* at *3.

---

[20]Based on this information, the mother then sought the Kentucky equivalent of an order of protection. *Ghayoumi*, 2006 WL 1994556, at *2. Ironically, in the lawsuit against the evaluating psychologist, the father claimed that he never told the psychologist that he knew where the mother was living. *Id* at *8.

On appeal in *Ghayoumi*, the appellate court implicitly likened the psychologist-client relationship to a physician-patient relationship and differentiated between a patient's relationship with a treating physician as opposed to a physician ordered to evaluate a party in a lawsuit. With a treating physician, the appellate court explained, confidentiality can be expected because the patient chose the physician for treatment in the context of a consensual, contractual relationship. "Consequently, when a doctor breaches his duty of secrecy, he is in violation of part of his obligations under the contract." *Id.* at *4 (quoting *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 407 (Tenn. 2002)); *see also Kinsella*, 696 A.2d at 566 ("Patients are aware of the privilege and its limits because psychotherapists generally believe themselves to be ethically bound at the outset of the therapy relationship to inform their patients of the limits of confidentiality."). In contrast, when a physician is appointed by the trial court to perform an evaluation, there is no confidential patient-physician relationship. The role of the court-appointed evaluating physician necessitates disclosure of the physician's records and communications because his report and recommendations must be submitted to the trial court. *Ghayoumi*, 2006 WL 1994556, at *4; *see Fitzgibbon v. Fitzgibbon*, 484 A.2d 46, 49 (N.J. Super. Ch. 1984) (holding that "test data" derived from tests administered by court-appointed evaluator is not privileged).

*Ghayoumi* clarifies that a party's oral communications with a court-appointed evaluator are neither privileged nor confidential. *Ghayoumi* does not address whether a party's act of voluntarily permitting a court-appointed evaluating psychologist to speak to his treating psychologist or review privileged mental health records constitutes a waiver of the psychologist-client privilege as to all or part of his mental health records.[21] *See* Melvin G. Goldzband, M.D., Review of Clinical Psychology and the Law, *Confidentiality in Disputes Over Custody and Visitation*, 1 Rev. Clinical Psychiatry & L. 133, 135 (ed. Robert L. Simon, M.D., 1990) (opining that "[t]here is simply not a doctor-patient relationship in any medicolegal evaluation such as exists in a therapeutic regimen," but "of course, confidentiality [in therapeutic treatment] must be protected, even fought for"), *cited in Kinsella*, 696 A.2d at 579. Neither party has cited Tennessee authority addressing this issue, so we look to other authorities.

The practice of giving a Rule 35 evaluator access to prior mental health records is not uncommon:

> As a matter of routine, a court-appointed or lawyer-appointed evaluator asks
> for the psychiatric records of the parents or child, and they usually get them.
> An evaluator would be remiss in not obtaining these records, for on cross-

---

[21]The record does not contain an order compelling Father to comply with Dr. Ciocca's request that he give Dr. Ciocca access to his privileged mental health records.

examination the evaluator would likely be asked about matters revealed there, and legitimately so. Typical questions: "Didn't you know that she (or he) was diagnosed as schizophrenic?" "Didn't you now that she (or he) threatened the life of the child?

Even an expert who may not need the records to carry out an evaluation will want them to defuse the cross-examination, and also to confirm the evaluation, thereby enhancing the probative value of the report. This is all the more true where a party resists the producing of the records. When a party refuses such a request, suspicion arises that the party is hiding something, and the records gain even more importance. Moreover, refusing to disclose psychiatric records is usually an expensive and time-consuming exercise in futility, as the trial judge will likely order disclosure.

Slovenko, *supra*, at 164-65. Prior to the evaluation, some evaluators may require parties to execute a release, agreeing to provide the evaluator access to prior mental health records. In other situations, as with Dr. Clement in the case at bar, the parties may agree that both will give the evaluating psychologist access to prior mental health records. Few courts have analyzed the consequences of such voluntary disclosure of privileged information. Does the party's voluntary disclosure of some privileged information to an evaluating psychologist, appointed by the court either by agreement of the parties or under Rule 35, constitute a general waiver of the psychologist-client privilege as to all privileged records? We examine the few cases addressing this question.

In a widely-cited divorce case, the Supreme Court of New Jersey discussed the issue of waiver in some depth. *See Kinsella v. Kinsella*, 696 A.2d 556 (N.J. 1997). In *Kinsella*, both parties alleged "extreme cruelty" against the other. The mother alleged that the father was physically abusive and had a drinking problem; she asked the trial court not to allow the father unsupervised overnight visitation with the parties' children. The divorce court appointed a psychologist, Dr. Montgomery, to evaluate the parties and assist the court in making parenting decisions. In conducting her evaluation, Dr. Montgomery consulted with the father's treating psychologist.[22] Ultimately, Dr. Montgomery recommended that the trial court permit the father overnight visitation with the children. *Id.* at 562. The mother, dissatisfied with Dr. Montgomery's recommendation, asked the trial court to require the father to release the records of his treating psychologist; she argued that he had waived the psychologist-client privilege. The divorce court and the intermediate appellate court both

---

[22]Dr. Montgomery consulted only with the treating psychologist for the father; she did not consult with the treating psychologists for the mother or the children.

held that the father had waived the privilege for some purposes, but not others. The case was appealed to the New Jersey Supreme Court.

The factually-complex case raised a plethora of issues. In the course of addressing them, the *Kinsella* Court undertook a thorough analysis of the psychologist-client privilege and waiver thereof. As this Court did in *Culbertson I*, the *Kinsella* Court ultimately adopted the approach to the psychologist-client privilege that is more protective of privileged information. In explaining its reasoning, *Kinsella* noted that the United States Supreme Court in *Jaffee* endorsed a "strong version of the psychotherapist-patient privilege that would not be contingent on a case-by-case balancing of the patient's privacy with the evidentiary need for disclosure."[23] *Id.* at 567 (citing *Jaffee*, 518 U.S. at 17). The *Kinsella* Court also recognized that New Jersey's laws, like those in Tennessee, model the psychologist-client privilege after the attorney-client privilege.[24] *Id.*

Ultimately, the *Kinsella* Court found that the trial court in the first instance had not "properly balanced the need for the records with the important public policy underlying the psychologist-patient privilege," so the New Jersey Supreme Court remanded the issue of waiver to the trial court.[25] *Kinsella* recognized that one of the questions in the instant appeal would arise on remand; it noted "that a problem of scope of waiver arises when a party executes specific purpose releases or otherwise partially waives the psychologist-patient privilege in order to allow a psychologist who has been appointed or hired for the purpose of litigation to review records or consult with a treating psychologist." *Id.* at 582. The appellate court in *Kinsella* did not address the scope of such a waiver but left the issue for the trial court on remand.

Another divorce case, *Cabrera v. Cabrera*, 580 A.2d 1227, 1230 (Conn. Ct. App. 1990), cited in *Kinsella*, presents the issue in this appeal more directly. In *Cabrera*, prior to the

---

[23] *Kinsella* placed considerable reliance on the recommendations of a task force established by the American Psychiatric Association, formed "to study court-ordered disclosure of confidential communications between patients and treating psychiatrists for use in custody disputes." *Id.* (citing American Psychiatric Association, Task Force Report 31, Disclosure of Psychiatric Treatment Records in Child Custody Disputes 4 (1991) ("Task Force Report")).

[24] The psychologist-client privilege in New Jersey is found in N.J.S.A. 45:14B-28, which is incorporated in Rule 505 of the New Jersey Rules of Evidence.

[25] In New Jersey, absent waiver, a party seeking disclosure of privileged materials must establish three "foundations" under the so-called "*Kovlov*" test: "(1) there must be a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) by a fair preponderance of the evidence, the party must show that the information cannot be secured from any less intrusive source." *Id.* at 568 (citing *In re Kozlov*, 398 A.2d 882 (1979)).

filing of the divorce complaint, the mother was hospitalized for two weeks for treatment of mental health problems. The divorce court appointed a psychologist to perform a custody evaluation of both parties. Separately, it directed a court family relations officer to make a custody recommendation based only on the mother's prior mental health records. When the court-appointed psychologist and the family relations officer both filed reports with the trial court, they made conflicting recommendations: the evaluating psychologist recommended designation of the mother as the primary residential parent, and the family relations officer recommended designation of the father. The father asked the trial court to require the mother to produce the mental health records on which the family relations officer relied in her report, and the trial court rejected the father's request. The trial court then adopted the recommendation of the evaluating psychologist and granted the mother sole custody of the parties' children. *Id.* at 1230-31. The father appealed.

On appeal in *Cabrera*, the father argued that the trial court erred in refusing to give him access to the mother's mental health records. The father noted that the mother had executed several releases for her mental health records, such as releases to her attorney, her family members, and to the family relations officers assigned to the parties' divorce case. The father argued that, by executing those releases and by allowing the evaluating psychologist to testify after her review of the privileged records, any claim of confidentiality in her treatment was destroyed and the mother had effectively waived the psychologist-client privilege. *Id.* at 1233. The appellate court disagreed. It held that the releases did not constitute a general waiver of the psychologist-client privilege, because the mother executed the releases to certain persons for specific purposes. The appellate court in *Cabrera* held that the mother's execution of the releases constituted only "limited" waiver:

> If no exception is provided under the statute, privileged communications can be disclosed only if the privilege is waived. *See State v. Toste*, 178 Conn. 626, 424 A.2d 293 (1979). Generally, any such waiver "must be the intelligent relinquishment of a known right. A necessary element to waiver is the requisite knowledge of the right and a waiver presupposes a full knowledge of an existing right or privilege and something done designedly or knowingly to relinquish it." *Id.* at 629-30, 424 A.2d 293.

> The *Toste* standard for determining the existence of waiver of the privilege should be applied here. In this case, each of the several releases executed was limited to a specific person or agency for a specific purpose. The very fact that a release to each of those individuals was deemed needed indicates that the releases to the others did not constitute general waivers, but were, as the plaintiff claims, limited releases. If the plaintiff believed each waiver was limited, it could only reasonably be concluded that no general waiver was

intelligently executed by her. We, therefore, hold that the psychologist-patient privilege in this case was not waived by the limited releases the plaintiff executed.

*Id.* at 1233-34. Because each of the releases the mother executed limited disclosure to the person identified in the release, the **Cabrera** court held, the releases were not a general waiver of the psychologist-client privilege and the mother was not compelled to disclose her mental health records to the father. The **Cabrera** Court said, "Although information about an individual's mental health may indeed be relevant to the award of alimony and the distribution of property, as it surely is to the award of custody, the sources of information are limited by" the state privilege statute. *Id.* at 1234. It stated that the fact that the trial court must take the parents' mental health into consideration in determining a child's best interest did not render the psychologist-client privilege unavailable to the mother. *Id.*; *see* Tenn. Code Ann. § 36-6-106(a)(5).

The concept of limited waiver was also discussed in a post-divorce California case, **Trepeck v. Tripeck (In re Trepeck)**, No. D048190, 2007 WL 831674 (Cal. Ct. App. 4th Dist. Mar. 20, 2007).[26] In **Trepeck**, the mother petitioned for permission to move with the parties' children to Michigan, where the parties originally lived. To aid the trial court in its decision, both parties agreed to undergo a court-ordered evaluation by a psychologist, Dr. Sparta. In a written stipulation, the parties agreed to "sign any and all releases requested by the evaluator . . . to enable the evaluator to gather information and/or to permit the evaluator to speak with other persons including . . . other mental health professionals who have been involved with either party . . . ." *Id.* at *23-24.

After Dr. Sparta completed his evaluation of both parties, the father served a subpoena on the mother's treating psychotherapist requesting all of the mother's mental health records. In the mother's motion to quash the subpoena, she argued that she had not placed her mental health "at issue" by engaging in the custody dispute, and that the stipulation allowing Dr. Sparta access to her psychotherapist did not constitute a waiver of the psychologist-client privilege as to all of her mental health records. The trial court agreed with the mother and granted her motion to quash the father's subpoena. After a trial, the mother was permitted to move to Michigan with the children. The father appealed.

On appeal in **Trepeck**, the father argued that the lower court erred in quashing the subpoena because, by signing the stipulation, the mother had waived the privilege as to her

---

[26]The **Trepeck** case is designated as "not to be published," but given the dearth of cases with similar facts that address the issue presented in this appeal, we exercise our discretion and cite it as persuasive non-binding authority.

psychotherapist's records. The father argued, as does Mother in the instant case, that "[o]nce statements have been revealed to third persons in a communication that is not itself privileged they are no longer confidential."[27] *Id.* The appellate court in *Trepeck* rejected that argument and found that the stipulation executed by the mother was not a broad waiver. It held: "[T]he waiver of an important right must be voluntary and knowing, with sufficient awareness of the likely consequences of the waiver. The language of the parties' stipulation acknowledges [that the mother] waived the privilege for purposes of Dr. Sparta's evaluation, and no further." *Id.* at *24. A broader construction, the *Trepeck* Court held, "would substantially defeat the privacy afforded by the psychotherapist-patient privilege . . . ." *Id.*

In *Meteer v. Herr*, No. B154682, 2003 WL 1084650 (Cal. App. 2 Dist. Mar 12, 2003), the parties in a custody dispute agreed on an examiner to conduct a parenting evaluation for the trial court.[28] The examiner's letter of engagement stated that both parties waived all privileges "to permit the evaluator to have access to . . . mental health . . . records, to confer with . . . therapists . . . and other persons whom the evaluator believes are necessary for the purpose of performing the evaluation and for them to confer with the evaluator. It is understood that the psychotherapist-patient privilege is waived." *Id.* at *16. The evaluation was completed and filed with the trial court in August 1999.

In September 1999, after the examiner completed his evaluation of the parties, the mother spent about a week in a mental hospital undergoing psychiatric treatment. After the mother was discharged, the father in *Meteer* issued a subpoena seeking the records for the mother's September 1999 treatment. The father acknowledged that the mother's September 1999 psychiatric treatment was not included in the examiner's August 1999 report, but noted that the engagement letter the parties executed for the court-ordered evaluation included a general waiver of the psychologist-client privilege.[29] The father also argued that the mother "tendered her mental and emotional condition" by signing the engagement letter and by

---

[27]On appeal, the father attempted to argue that, instead of quashing the father's subpoena outright, the trial court perhaps should have narrowed the scope of the subpoena to the psychotherapist's conversation with Dr. Sparta. Because the father did not make this argument in the trial court, the appellate court refused to consider it. *Trepeck*, 2007 WL 831647, at *19-20.

[28]The *Meteer* case is also designated as "not to be published." For the same reason as *Trepeck*, we exercise our discretion and cite the case as non-binding persuasive authority on the issue in this appeal.

[29]The relevant California rule of evidence provides that waiver of a privilege occurs if the holder of the privilege "has disclosed a significant part of the communication or has consented to such disclosure made by anyone." Cal. Evid. Code § 912.

seeking to rely on the examiner's report at trial.[30]  *Id.* at \*5-6.  For these reasons, the father contended that the mother had generally waived her right to assert the psychologist-client privilege as to all of her mental health records.

The California appellate court in ***Meteer*** disagreed with the father's argument.  It held that the written waiver in the examiner's engagement letter did not apply to any rights that might accrue to the mother in the future. When the mother signed the engagement letter, ***Meteer*** held, she consented to waive the psychologist-client privilege only as to "her psychiatric history to that point, but not concerning events which had not yet happened."  *Id.* at \*7.  The appellate court also rejected the argument that, by relying on the examiner's report, the mother had "tendered her mental condition," because either party could call the court-ordered examiner as a witness.  A contrary ruling, the ***Meteer*** Court held, "would discourage the kind of evaluation which [the examiner] undertook — a disinterested party's snapshot analysis of family relationships and parental skills.  This kind of analysis is especially helpful to a family law court and, as a matter of policy, ought not to be discouraged."  *Id.* at \*8.

In ***M.M. v. L.M.***, 55 A.3d 1167 (Pa. Super. Ct. 2012), a Pennsylvania divorce case, the father was diagnosed with bipolar personality disorder.  The father was hospitalized multiple times for this condition and "his mental health [was] at issue throughout [the] custody litigation."  *Id.* at 1169.  At some point during the proceedings, the father executed a release to allow the mother to depose his treating psychiatrist, and to allow his treating psychiatrist to give the mother specified information on whether the father had complied with his responsibilities regarding appointments and drug treatment. Despite the father's execution of the release, the deposition of his psychiatrist never took place.  *Id.*

Later, after another incident,[31] the father was again hospitalized for mental health treatment.  The divorce court in ***M.M.*** ordered the father to undergo an updated psychological evaluation, but the updated evaluation never took place.  Instead, the mother filed a petition asking the divorce court to require the father to turn over the records concerning his recent mental health hospitalization.  By signing the release in anticipation of the deposition of his psychiatrist, the mother argued, the father waived any privilege in his mental health records.  In response, the father contended that the release he signed was narrow in scope and did not constitute a general waiver.  The divorce court in ***M.M.*** ordered the father to produce the records, and the father appealed.  *Id.* at 1170.

---

[30] Another California rule of evidence provides that there is no psychologist-client privilege if the patient's mental or emotional condition is "tendered by" the patient.  Cal. Evid. Code § 1016.

[31] Allegedly, the father bit the ear of the child's maternal grandfather.

On appeal in *M.M.*, the father again maintained that the release he executed was limited in scope and that his consent to the deposition of his treating psychiatrist did not constitute a waiver of the privilege as to the psychiatrist's records. The appellate court agreed. The *M.M.* court held that the father's communications with his psychiatrist and psychologist were privileged and could not be released without the father's written consent. The court observed that the father had submitted to a court-ordered evaluation, and that the father "permitted the appointed psychologist to access his mental health information and treatments in order to facilitate the evaluation." *Id.* at 1175. The appellate court held, however, that permitting the court-appointed psychologist to see his mental health records did not constitute a general waiver of the psychologist-client privilege. The *M.M.* court noted a "preference for an updated psychological evaluation over the compelled disclosure of statutorily privileged mental health records to a party opponent." *Id.* The mother argued that she needed the father's privileged mental health records to "assess or anticipate the ebb and flow of [the father's] mental stability . . . [or] assist the Court with managing [the father's] mental health," that an updated evaluation was not sufficient under the circumstances. The appellate court in *M.M.* rejected this argument:

> Tellingly, Mother's only explanation for forgoing the updated mental health evaluation by a court-appointed expert and, instead, demanding the wholesale disclosure of the mental health record, is to provide her own expert witness a basis to proffer an opinion "as to how to handle Father's condition and his ability to parent with this condition." *Id.* Indeed, the crux of Mother's position is that she prefers to present her expert's opinion to the trial court rather than the unquestionably neutral conclusion of the court-appointed mental health expert. *See id.* at 13 ("Mother receiving [Father's] records now allows her to decide her strategy . . . or it may serve to sooth (sic) both she and the Court's nerve's about Father's well-being.") As achieving H.M.'s best interest, rather than soothing Mother's nerves, is the cynosure of this custody litigation, Mother's myopic perspective is unpersuasive.

> As we observed in *Gates*, *supra*, the chilling effect associated with permitting one parent to intrude upon the other parent's confidential relationships with his or her mental health professionals compromises the child's best interests because the parent receiving mental health treatment will be less candid with the treating professionals. Accordingly, having failed to establish that the least intrusive alternative, *i.e.*, updating Father's psychological evaluation, is insufficient to determine the effects of Father's mental health upon H.M.'s best interest, Mother's position requiring the total disclosure of Father's mental health records fails.

*Id.* at 1175. Thus, the ***M.M.*** court held that the father did not waive the privilege either by submitting to the court-ordered evaluation or by giving the court-ordered examiner access to his mental health records, where the "alternative to [the father] complying with the [evaluation] would have required his wholesale disclosure of his privileged mental health information." ***Id.*** at 1176.

The ***M.M.*** court also held that the father's execution of a release as to some of his treating psychiatrist's records did not constitute a general waiver of the privilege. ***Id.*** The court noted that "opinions, observations, and diagnoses" are not protected by the privilege under Pennsylvania caselaw, and that the information from the father's records that was actually released was limited to these non-privileged subjects. ***Id.*** (citing ***Gates***, 967 A.2d at 1031). The court also held that the father's grant of permission for a limited deposition of his psychiatrist did not amount to a waiver of the privilege to the father's mental health records. The ***M.M.*** court therefore held that the father was not required to disclose to the mother the privileged records on his hospitalization. ***Id.*** at 1177.

While some of these cases find a limited waiver, none hold that voluntarily disclosing some privileged information to an evaluating psychologist or giving the evaluator access to treating mental health professionals results in an overall waiver of the psychologist-client privilege, as the trial court below held. We hold that neither Father's consent to giving Dr. Clement or Dr. Ciocca access to his treating psychologists nor his voluntary disclosure of some of his mental health records to Dr. Clement or Dr. Ciocca constitutes a full and general waiver of the psychologist-client privilege as to all of Father's mental health records.

Even though Father's actions did not amount to an overall waiver of the psychologist-client privilege as to all of his privileged mental health records, we must still consider whether they constituted a waiver to *any* extent. In the cases discussed above, under similar circumstances, the courts came to differing conclusions about whether the psychologist-client privilege was waived and, if so, the extent of the waiver. "Courts do not agree on whether there can be a less-than-complete waiver of the privilege, and, if so, which testimony or records fairly come within the scope of the waiver." Boumil, ***supra***, at 10. Indeed, courts do not even agree on what to call such a waiver: "There is . . . no uniformity among courts as to the proper terminology for a less-than-complete waiver of the psychotherapist-patient privilege, and various courts refer to 'limited,' 'partial,' or 'selective' waivers of the privilege."[32] ***Id.***

_____

[32]It is difficult, nigh impossible, to reconcile the caselaw from the various jurisdictions on the issue in this appeal, because each case involves a different set of facts and each state applies its own patchwork of statutes, court rules, and court-devised tests on the psychologist-client privilege and any waiver of the

(continued...)

We note that, if an evaluating psychologist requests access to privileged information, in the absence of a court order compelling such disclosure, the party to be evaluated may decline the examiner's request for the privileged information. *See McIntyre v. McIntyre,* 404 So. 2d 208, 209 (Fla. Dist. Ct. App. 1981) (mother permitted to exercise privilege and decline court-appointed psychologist's request for access to her mental health records); *accord Attorney ad Litem for D.K. v. Parents of D.K.,* 780 So. 2d 301, 308-09 (Fla. Dist. Ct. App. 2001); *see also Menendez v. Superior Ct.*, 834 P.2d 786, 789 (Cal. 1992). This is so even if the trial court has ordered the party to undergo a Rule 35 examination.[33] *McIntyre,* 404 So. 2d at 209. Because the party to be examined has the option of declining the evaluator's request for privileged information, any disclosure of such privileged information to the evaluator would be considered voluntary.

The party to be examined may be concerned that there will be a strategic cost to refusing the examiner's request for access to privileged records. Absent a court order requiring disclosure, however, the decision on whether to accede to the examiner's request is a strategic one. Like any privilege, the psychologist-client privilege belongs to its holder, who can waive it or not as he sees fit:

> A party would only voluntarily waive her psychotherapist-patient privilege (and allow a consult with her psychotherapist) if doing so were expected to provide some sort of strategic advantage. If, for example, a party presents for mental examination appearing disorganized or even paranoid, an ongoing psychotherapist may be able to provide context for the paranoid or disorganized presentation. On the other hand, a high-functioning, albeit mentally-compromised party may successfully "prepare" for psychological testing and influence the results to appear healthier than she actually is — a finding that a long-term psychotherapist would likely dispute if asked.

Boumil, *supra*, at 24 (footnotes omitted). Absent compulsion by the court, the party holding the privilege remains free to decline the examiner's request for access to privileged mental health records.

Applying established legal principles, if the disclosure (absent court order) of privileged information to an evaluating psychologist for a court-ordered evaluation is voluntary, it must

---

[32](...continued)
privilege.

[33]The circumstances under which a trial court may, even in the absence of waiver, compel disclosure of privileged information are discussed separately below.

necessarily constitute a waiver of the privilege with respect to the information actually disclosed. With the analogous attorney-client privilege, it is well-settled that the client can waive the privilege "either by communicating in the presence of others who are not bound by the privilege, or by voluntarily divulging the communication to third parties." **Boyd**, 88 S.W.3d at 213 (citations omitted). **See also State v. Burford**, 216 S.W.3d 323, 326 (Tenn. Ct. App. 2007) ("If a client divulges the communications he seeks to protect, then he has waived the attorney-client privilege with respect to the reported communications. . . ."). Thus, under the facts of this case, if Father in fact voluntarily disclosed privileged information to either Dr. Clement or Dr. Ciocca, he waived the privilege as to the information that was actually disclosed by Father or with Father's express permission.[34]

Unfortunately, the trial court below made no factual findings as to what privileged information, if any, Father disclosed in the evaluations, or what privileged information was divulged to Dr. Clement or Dr. Ciocca. Instead, the trial court made a sweeping holding of overall waiver based on the erroneous premise that Father placed his mental health at issue by defending against Mother's allegations that he was mentally unstable. As a result, in the record before us, we are unable to ascertain whether information subject to the psychologist-client privilege was voluntarily disclosed by Father to either Dr. Clement or Dr. Ciocca, and thus are unable to determine the extent to which Father waived the psychologist-client privilege. We are left with little choice but to remand the case to the trial court for factual findings on the privileged information, if any, that was disclosed to Drs. Clement or Ciocca by Father or with Father's express permission.

Some guidelines are in order. On remand, the trial court must bear in mind that, as noted above, the psychologist-client privilege attaches to personal communications made by the patient to his treating psychologist, not to the treating psychologist's "opinion, observations, diagnosis, or treatment alternatives." Best, **supra**, 44 A.L.R.3d at § 4(e) (supp.); **see also M.M.,** 55 A.3d at 1174-76. If Father's treating psychologists disclosed only non-privileged information, then there is no waiver arising from the evaluating psychologists' contact with Father's treating psychologists. If any of Father's treating psychologists disclosed privileged information to either Dr. Clement or Dr. Ciocca, this would constitute a waiver as to the

---

[34]The courts in **Cabrera** and **Trepeck** appear to hold that a privilege-holder's waiver of the privilege can be person-specific, that is, that the privilege-holder can limit his waiver of the privilege to the person specified in a release. **See Cabrera,** 580 A. 2d at 1233-34; **Trepeck,** 2007 WL 831674, at *23-24. We must respectfully disagree with this reasoning. Even if Father intended for the privileged information to be disclosed only to the evaluating psychologist, he cannot limit the waiver to a specific person. Voluntary disclosure of privileged information to an evaluating psychologist operates as a waiver, limited to the information actually disclosed with Father's express permission, but not limited as to person. We note that the question of waiver is separate from any contractual obligations or limitations that may flow from the execution of a document such as a release.

particular privileged information disclosed *only* if the disclosure was pursuant to the express permission of Father, the privilege-holder, for such disclosure.[35] Likewise, Father's voluntary disclosure of mental health records to Drs. Clement or Ciocca would constitute a waiver of the privilege only as to the records actually disclosed to either of the evaluators with Father's express permission.

### Vital Information

In addition to arguing waiver, Mother contends that Father should be required to produce all of his privileged mental health records because refusing to give her access to them would deny her "access to information vital to [her] defense." **Bryan**, 848 S.W.2d at 81. Mother insists that unfettered access to all of the records is necessary in order to effectively cross-examine the evaluating psychologists, to give her expert witness complete information from which to form an opinion, and to provide the trial court a complete picture of Father's mental health for its comparative fitness analysis. The trial court agreed with Mother; it held that Mother "has every right to engage her own expert who will have available all the information that would be deemed important to these such experts' opinions who may be presented on her behalf." The trial court held that requiring Mother "to proceed to trial without the benefit of the same information would work an even more grave injustice." So, to allow Mother to offer "her best evidence," the trial court ordered Father to produce all of his mental health records.

In jurisdictions that have adopted the more protective approach to the psychologist-patient privilege, courts have held that there are very limited circumstances under which the trial court may compel disclosure of privileged information, even where there has been no waiver of the privilege. For example, in **Kinsella,** discussed above, the New Jersey Supreme Court cited with approval the recommendations of a task force established by the American Psychiatric Association to study court-ordered disclosure of confidential communications between patients and treating psychiatrists for use in custody disputes.[36] **Kinsella,** 696 A.2d

---

[35]In determining whether a disclosure of privileged information by a treating psychologist constitutes a waiver of the privilege, the focus is on the acts of the holder of the privilege. By analogy, in determining whether the principal is bound by the actions of a purported agent, the focus is on the principal's actions. ***See e.g., Barbee v. Kindred Healthcare Op., Inc.***, 2008 WL 4615858, at *6 (Tenn. Ct. App. Oct. 20, 2008). For example, if the treating psychologist disclosed Father's privileged information to a Rule 35 examiner but did not have Father's permission to do so, this would not constitute a waiver by Father of the privilege as to the information disclosed.

[36]The Task Force advocated a protective approach to privileged mental health records, favoring disclosure of psychiatric treatment records only in cases where the trial court made findings that "(1) the treatment was
(continued...)

at 582-83. The Court remanded the case to the trial court for reconsideration of whether the father should be compelled to disclose the records of his treating psychologist. As guidance to the lower court, the New Jersey Supreme Court advised that, in most cases in which a parent's mental health is at issue, trial courts should use evaluation by an independent examiner, either appointed by the court or hired by the parties for the purpose of the litigation, instead of the records of the parties' treating mental health professionals. *Id.* at 583. The *Kinsella* court emphasized that "compulsory psychiatric examination" is available to trial courts as "an alternate tool which may accomplish both purposes," namely, preserving the privilege and also giving the trial court the information necessary to determine the parenting arrangement that is in the child's best interest. *Id.* at 579. The court commented that, "in most  cases, the assistance provided by independent experts should be sufficient." *Id.* at 583. The trial court should consider piercing the privilege, *Kinsella* held, only where it is clear that the information from the independent examiner is inadequate and there is "independent evidence of potential for harm to the child."[37] *Id.*  The *Kinsella* Court stressed that "only in the most compelling circumstances should the courts permit the privilege to be pierced." *Id.* at 584.

Other courts have underscored the importance of the psychologist-client privilege and indicated that the Tenn. R. Civ. P. 35 examination is the tool of choice for evaluating the mental health of a parent or guardian in a child custody dispute. *See, e.g., Laznovsky v. Laznovsky*, 745 A.2d 1054, 1071-72 (Md. 2000) (noting that, if party to custody dispute declines to produce privileged mental health records, trial court has option of ordering mental health examination); *accord Simek v. Superior Court*, 172 Cal. Rptr. 564, 569 (1981); *Roper v. Roper*, 336 So. 2d 654, 656 (Fla. Dist. Ct. App. 1976); *Barker v. Barker*, 440 P.2d 137, 139 (Idaho 1968).

Along these lines, this Court has held that the fact that one parent in a custody dispute had a mental illness was not sufficient in and of itself for the trial court to order disclosure of the parent's mental health records, and that the other parent should instead seek an examination pursuant to Tenn. R. Civ. P. 35. *Herman*, 2012 WL 1655717, at *2. The *Herman* Court granted a Rule 10 extraordinary appeal after the trial court ordered the mother, who suffered

---

[36](...continued)
recent enough to be relevant; (2) substantive independent evidence of serious impairment exists; (3) sufficient evidence is unavailable elsewhere; (4) court-ordered evaluations are an inadequate substitute for disclosure; (5) given the severity of the alleged disorder, communications made in the course of treatment are likely to be relevant." *Kinsella,* 696 A.2d at 583 (citations to report omitted).

[37]Once that threshold is met, the *Kinsella* court stated, the trial court should conduct an *in camera* inspection of the privileged records in question and order the release only of materials that are relevant to the issues before the court. *Kinsella*, 696 A.2d at 583.

from multiple personality disorder, to release her mental health records. The appellate court observed that the mother had the right not to waive the privilege as to her mental health records, and commented that the fact that one party to the custody dispute had a mental illness "is not . . . a license to disregard statutory privileges from disclosure." *Id.* It reversed the trial court's order compelling disclosure of the mother's mental health records and invited the father, on remand, to seek a Rule 35 examination of the mother. *Id.*

In the case at bar, considering the approach outlined in *Kinsella*, Mother has offered no valid reason why the evaluations of Dr. Clement and Dr. Ciocca are "an inadequate substitute for disclosure," apart from the fact that Mother is convinced that Drs. Clement and Ciocca reached erroneous conclusions. *Kinsella,* 696 A.2d at 583. Mother has made no showing in this record that sufficient evidence is unavailable outside of Father's privileged mental health records or that the mental health records are "likely to contain relevant evidence that could not be obtained elsewhere." *Id.* Mother's vigorous disagreement with the conclusions of the evaluating psychologists and her desire to peruse Father's mental health records do not amount to a basis for compelling Father to disclose information that remains privileged. For this reason, we must reject her argument that Father's mental health records constitute "information vital to [her] defense." As the court observed in *M.M.* under similar circumstances, "the crux of Mother's position is that she prefers to present her expert's opinion to the trial court rather than the unquestionably neutral conclusion of the court-appointed mental health expert. As achieving [the child's] best interest, rather than soothing Mother's nerves, is the cynosure of this custody litigation, Mother's myopic perspective is unpersuasive." *M.M.*, 55 A 3d at 1174, 1175.

### Rule 703

Mother also argues that the Tennessee Rules of Evidence support the trial court's decision to grant her full access to all of Father's mental health records. The trial court's holding was based primarily on its finding of waiver, but the order that is the subject of this appeal also stated that "it would. . . be an injustice to preclude [Mother] from offering her best evidence, which includes responding to [Father's] evidence of his psychological condition and the opinions of experts called by [Father] and reviewing the underlying data of those experts, pursuant to the Tennessee Rules of Evidence."

In support of her argument, Mother relies primarily on Rule 703 of the Tennessee Rules of Evidence. Rule 703 states that a trial court "shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."[38] Tenn.

---

[38]Rule 703 provides:

(continued...)

R. Evid. 703. Mother claims that, pursuant to Rule 703, to assess the trustworthiness of the opinion of the Rule 35 expert, the trial court must determine whether the facts and data underlying the expert's opinion are trustworthy. In the absence of the underlying data on which Dr. Ciocca relied, Mother contends, the trial court cannot adequately assess Dr. Ciocca's report. In light of this, Mother argues that she too should have access to the underlying data to evaluate the trustworthiness of Dr. Ciocca's expert opinion.

This argument on appeal is pretermitted by our holding that Father's voluntary disclosure of privileged information to either of the Rule 35 examiners would constitute a limited waiver of the psychologist-client privilege, to the extent of the privileged information actually disclosed with Father's express permission. Once the trial court ascertains the information disclosed to the Rule 35 examiners that falls within this ambit, Mother will be able to review and utilize the information. This should be sufficient for Mother to probe the trustworthiness of the Rule 35 examiner and cross-examine Father.

**Amendment to Statute**

After the briefing in this appeal was completed, Mother filed a supplemental brief in which she argued that a recent amendment to Tennessee Code Annotated 36-6-106(a)(5) "clarified that a trial court may order the disclosure of confidential mental health information when making a proper determination of custody in divorce proceedings." Section 36-6-106 itself lists relevant factors to be considered in making custody decisions. Prior to the recent amendment, Subsection (a)(5) of the statute stated the fifth relevant factor as "[t]he mental and physical health of the parents or caregivers." Tenn. Code Ann. § 36-6-106(a)(5). This language is unchanged by the amendment, but effective July 1, 2013, the amendment adds language on the compelled disclosure of confidential mental health information of a parent under certain circumstances. The subsection, as amended, now reads:

---

[38](...continued)

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

> The court shall consider all relevant factors, including the following, where applicable:
>
> . . .
>
> (5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, ***if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3).*** The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings . . . .

Tenn. Code Ann. § 36-6-106(a)(5) (Supp. 2013) (emphasis added).

Mother argues: "Pursuant to these statutes, the trial court may order the disclosure of a party's mental health records, *without his or her consent . . . .*" She asserts that the trial court's order fully complied with the new statute in requiring Father to disclose his mental health records without his consent, regardless of whether he waived the psychologist-client privilege.

First and foremost, Mother's argument ignores the fact that the amendment to Section 36-6-106(a)(5) was not in effect when the trial court entered its July 23, 2012 order. "Statutes are presumed to operate prospectively unless the legislature clearly indicates otherwise." ***Nutt v. Champion Int'l Corp.***, 980 S.W.2d 365, 368 (Tenn. 1998). Mother cites nothing indicating that the amendment to the statute was intended to apply retroactively.

Moreover, even if the amendment were applicable, Mother has not established that the mental health records that remain privileged — that is, the records that Father *did not* voluntarily disclose to either Dr. Clement or Dr Ciocca — are "necessary to the proceedings" below, as required under the statute as amended. The phrase "necessary to the proceedings" obviously means substantially more than simply "relevant to the proceedings." As discussed more fully above, Mother has not shown that the evaluations by Dr. Clement and Dr. Ciocca are an inadequate substitute for disclosure of Father's privileged mental health records, that sufficient evidence is unavailable outside of Father's privileged mental health records, or that the mental health records are likely to contain relevant information that could not be obtained elsewhere. Under these circumstances, we find no evidence in the record that would support a finding that Father's privileged records are "necessary to the proceedings" as required under the amendment.

Father raises an interesting argument regarding the amendment to Section 36-6-106(a)(5). He contends that the reference in the amendment to Section 33-3-105(3) indicates that the amendment is intended to apply only in cases involving mentally ill and retarded persons who are in the custody of the State of Tennessee. Indeed, Title 33 "deals with mentally ill and retarded persons in the care and custody of the State." *State v. Fox*, 733 S.W.2d 116, 118 n.1 (Tenn. Crim. Ct. App. 1987), *quoted in Herman*, 2012 WL 1655717 at *2. Since Father is not a mentally ill or retarded person in the custody of the State, he argues, the amendment specifically referring to Title 33 is inapplicable in this case.

Fully addressing Father's argument on the interpretation of the amendment to Section 36-6-106(a)(5) would require us to apply the traditional rules of statutory construction to ascertain whether the legislature intended for the amendment to apply only to parents who are either mentally ill or retarded and are in the custody of the state. We need not do so. Because the amendment was not in effect when the trial court entered its July 23, 2012 order, and Mother has given us no basis for concluding that the legislature intended for the amendment to be applied retroactively, we conclude that the recent amendment is inapplicable to this appeal.

### *In Camera* Review of Records

In *Culbertson I*, we held that Father's mental health records "shall be disclosed to the trial court for an *in camera* review for the purpose of conducting the comparative fitness analysis." *Culbertson I*, 393 S.W.3d at 687. Apparently, the trial court did not perform the *in camera* review referenced in *Culbertson I*.

On remand, both Dr. Clement and Dr. Ciocca will be available to testify about Father's mental health. Moreover, on remand, Mother will have access to any documents that Father voluntarily disclosed to either Dr. Clement or Dr. Ciocca. In light of these circumstances, the purpose for the directive in *Culbertson I* has been obviated.[39] On remand, the trial court may, in its discretion, perform an *in camera* review of the documents deemed to be within the limited waiver for the purpose of screening out any that are not relevant to the issues or

---

[39]We note also that, upon reflection, such an *in camera* review of all of a parent's mental health records for the purpose of a custody determination would prove to be problematic. As observed herein, there is some authority for permitting the trial court to conduct an *in camera* review of privileged documents essentially for evidentiary purposes, to assess whether some should be screened out as irrelevant or unduly prejudicial. However, we find no authority for allowing the trial court to consider the substance of privileged documents *in camera* for the purpose of making a parenting decision, without giving both parties access to the documents.

unduly prejudicial.[40]  But the trial court is no longer either directed or authorized to conduct an *in camera* review of Father's privileged mental health records for the general purpose of conducting its comparative fitness analysis.

### Constitutional Issues

Father argues that the trial court violated his due process and equal protection rights by refusing to hear his petition for unsupervised parenting time with the parties' children, particularly in light of the fact that both Dr. Clement and Dr. Ciocca concluded that Father was capable of safe, unsupervised visits.  Father still has not been granted a hearing on his petition, despite several attempts.  Based on these constitutional violations, Father asks this Court to vacate the trial court's orders limiting Father's parenting time and denying him unsupervised visitation, and order the trial court to conduct a hearing on his petition for a temporary parenting plan that includes unsupervised parenting time.

As discussed below, we have concerns about the issues Father seeks to raise. Despite these concerns, we must recognize that this is an extraordinary appeal, so the scope of our review is limited. Normally, the appellate review in a Rule 10 interlocutory appeal extends only to issues that were "specified in this court's order granting the extraordinary appeal." *Heatherly*, 43 S.W.3d at 914.  In the instant case, the order granting permission for the Rule 10 appeal does not specify the issues to be reviewed; it states only that the appellate court "hereby grants the Rule 10 application."  From our review of Father's application for permission for a Rule 10 extraordinary appeal and the fact that the appellate court order stayed only the July 23, 2012 order in its grant of permission for the appeal, as well as the fact that Father has pointed to no place in the record in which the constitutional arguments were raised to the trial court, we must conclude that the constitutional arguments Father now asserts are not included in our scope of review. *See In re S.L.M.*, 207 S.W.3d 288, 294 n.15 (Tenn. Ct. App. 2006) (declining to address issues beyond scope of issues defined in appellate court order granting Rule 9 interlocutory appeal); *Fayne v. Vincent*, 301 S.W.3d 162, 170-71 (Tenn. 2009)(issues not raised in trial court may not be raised for first time on appeal).  For these reasons, we must decline to address the constitutional arguments raised by Father in this appeal.

---

[40]Similarly, if there were a basis for the trial court to compel disclosure of documents that remain privileged, the trial court would have authority to perform an *in camera* inspection of the privileged documents, so that any order compelling release of privileged documents would include only those that are relevant and not unduly prejudicial. *See Kinsella,* 696 A.2d at 581-83 (citing cases).

## Proceedings on Remand

In considering the proceedings on remand, several concerns arise.

First, although we have found that the scope of our appellate review does not include the constitutional arguments Father seeks to raise regarding his parenting time, we are nevertheless troubled by the fact that all of Father's efforts just to get a hearing on his petition have been unavailing. In December 2010, Father agreed to temporary limited supervision of his parenting time, pending an evaluation by Dr. Clement. Since then, all of Father's efforts to obtain a hearing before the trial court on his request for unsupervised parenting time have been stymied by the continuing disputes over disclosure of his privileged mental health records, despite two separate court-ordered evaluations concluding that Father poses no threat of harm to his children. According to the parties, the trial court still has not held a hearing on Father's petition and Father's parenting time continues to take place under supervision at the Exchange Club.[41]

This Court has noted that "supervision of a parent's visitation with his or her child is a significant intrusion on the parent-child relationship. It is sometimes necessary in order to protect the child yet permit continuation of the relationship. It is not to be undertaken lightly or without a reasonable basis." **B.M.M. v. P.R.M.**, No. M2002-02242-COA-R3-CV, 2004 WL 1853418, at *18 (Tenn. Ct. App. Aug. 18, 2004). Even where the supervision requirement is initially implemented for good reason, the trial court should seek to end the supervision as soon as it is no longer needed:

> Unlike, for example, the designation of the primary residential parent, such supervision [of parenting time] is normally intended to continue only so long as there is a reasonable need for it. Other courts have noted that a trial court should modify the conditions of supervised visitation or end it altogether when "the allegations that necessitated the supervision are determined to be without 'credible evidence' . . . or . . . the noncustodial parent had demonstrated a clear ability to control the propensities which necessitated the supervision."

**Id.** (quoting **Carter v. Carter**, 470 S.E.2d 193, 200 (W. Va. 1996) (internal citations omitted)).

Second, regardless of whether the trial court was technically bound by the law of the case after this Court issued its opinion in **Culbertson I**, it is noteworthy that, in the order that is

---

[41]At oral argument, counsel for Father indicated that his parenting time continues to take place at the Exchange Club rather than in a home environment.

-57-

the subject of this appeal, the trial court's ruling demonstrates little inclination to follow the appellate court's ruling. The issues considered by the trial court after the opinion in *Culbertson I* was rendered were essentially the same issues decided in *Culbertson I,* except based on events that occurred *after* the appeal was filed. Despite this, the trial court adhered to the reasoning that was expressly rejected in *Culbertson I*. This gives us little hope that another remand to the trial judge below would yield compliance with this Court's directive in *Culbertson I*.

Even when a request for permission for further appeal is pending, "inferior courts must abide the orders, decrees and precedents of higher courts." *Weston v. State*, 60 S.W.3d 57, 59 (Tenn. 2001) (citing *State v. Irick*, 906 S.W.2d 440, 443 (Tenn. 1995); *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976)). When the lower court fails to do so, the appellate court is authorized to reassign the case to a different trial judge. "An appellate court may . . . order reassignment of a case to a different judge in the exercise of the court's inherent power to administer the system of appeals and remand." *See Rudd v. Rudd*, No. W2011-01007-COA-R3-CV, 2011 WL 6777030, at *7 (Tenn. Ct. App. Dec. 22, 2011) (quoting 5 Am. Jur. 2d Appellate Rev. § 754 (2007)). This Court has previously outlined factors to be considered in deciding whether reassignment is in order:

> "An appellate court may . . . order reassignment of a case to a different judge in the exercise of the court's inherent power to administer the system of appeals and remand." *See* 5 Am. Jur.2d Appellate Review § 754 (2007). Some factors to be considered by an appellate court in deciding whether to exercise its supervisory authority to reassign a case are: (1) whether on remand the trial judge can be expected to follow the dictates of the appellate court; (2) whether reassignment is advisable to maintain the appearance of justice; 3) whether reassignment risks undue waste and duplication. *Id.* (citing *United States v. Lyons*, 472 F.3d 1055, 1071 (9th Cir. 2007) (citing *United States v. Peyton*, 353 F.3d 1080, 1091 (9th Cir. 2003)). "In the rare case where a judge has repeatedly adhered to an erroneous view after the error is called to his attention . . ., reassignment to another judge may be advisable in order to avoid 'an exercise in futility in which the Court is merely marching up the hill only to march right down again.' " *Mahoney v. Loma Alta Prop. Owners Ass'n., Inc.*, No. 2100909, 2011 WL 5436274, at *10 (Ala. Civ. App. Nov. 10, 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 452, 92 S. Ct. 589, 594 (1972) (Blackmun, J., dissenting) (internal citation omitted)). *See also Bayer v. Global Renaissance Arts, Inc.*, 898 So. 2d 995, 996 (Fla. Dist. Ct. App. 2005) ("the trial judge's . . . resistance to follow[ing] this court's prior mandate indicates an unwillingness to follow our ruling in a fair and impartial manner," so case reassigned to different trial judge.).

*Id.*; *see also In re M.J.H.*, No. W2012-01281-COA-R3-JV, 2013 WL 3227044, at *13-14 (Tenn. Ct. App. June 25, 2013).

In the case at bar, it appears that the trial judge had difficulty putting his previous views aside and complying with the holding in *Culbertson I*. We find as well that reassignment to a different trial judge is advisable to preserve the appearance of justice. In assessing the third factor, whether reassignment would result in undue waste and duplication, we realize that the trial judge below has great familiarity with the case and specific knowledge of the parties. However, in light of the fact that this case has been the subject of *two* Rule 10 extraordinary appeals and Father has still not obtained a hearing on his request for unsupervised parenting time, we must conclude that reassigning this case to a different trial judge will not "entail 'waste . . . out of proportion to any gain in preserving the appearance of fairness.' " *Mahoney*, 2011 WL 5436274, at *10 (quoting *United States v. White*, 846 F.2d 678, 696 (11th Cir.1988)). Therefore, under the specific circumstances of this case, we deem it prudent to reassign the case to another trial judge on remand.

### Attorney Fees

Both parties seek an award of attorney fees and expenses for this appeal. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). In considering a request for appellate attorney fees, the appellate court should consider the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors. *Id.* (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). The appellate court may also award attorney fees on appeal to the appellee if it deems the appeal to be frivolous. *See* Tenn. Code Ann. § 27-1-122.

As we are reversing the trial court's decision, Father's appeal was obviously not frivolous. The case involved issues of first impression, the positions of both parties were grounded in legal principle, and both parties were well-represented. Given the equities in this case, we decline to award attorney fees on appeal to either party; each party should bear the burden of his or her own attorney fees.

### CONCLUSION

We vacate the trial court's July 23, 2012 order and hold that Father waived the psychologist-client privilege only to the limited extent that he voluntarily disclosed privileged mental health records and information to Drs. Clement or Ciocca. The cause must be remanded for

factual findings on any privileged mental health records Father voluntarily provided to either Dr. Clement or Dr. Ciocca, or any privileged information Father's treating psychologists provided to Drs. Clement or Ciocca with Father's express permission. As to any information for which the privilege was waived, the trial court may, in its discretion, conduct an *in camera* review of the information and screen out any that is not relevant or is unduly prejudicial, and it may enter an appropriate protective order. On remand, however, the first order of business should be to conduct a hearing on Father's request for a temporary parenting plan that grants him unsupervised parenting time with the parties' children.

Accordingly, the trial court's July 23, 2012 order is vacated. The cause is remanded to the Presiding Judge of the 30th Judicial District for reassignment to a different trial judge and for further proceedings consistent with this Opinion. The stay pending appeal entered by this Court on November 9, 2012, is hereby lifted. Costs on appeal are to be taxed to Plaintiff/Appellee Hannah Ann Culbertson, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE